# EXHIBIT 2

Deed Book 41978 Pg   476
Filed and Recorded Feb-16-2006 03:55pm
2006-0051324
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

Return to:
Linda B. Curry, Esq.
Weissman, Nowack, Curry & Wilco, P.C.
One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia  30326

## DECLARATION OF CONDOMINIUM

### FOR

### OVATION, A CONDOMINIUM

**WEISSMAN, NOWACK, CURRY & WILCO, P.C.**
Attorneys

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
(404) 926-4500

COPYRIGHT © 2005.
*ALL RIGHTS RESERVED. THIS DECLARATION MAY BE USED ONLY IN CONNECTION WITH THE PROPERTY AT OVATION, A CONDOMINIUM AND THE OPERATION OF THE OVATION CONDOMINIUM ASSOCIATION, INC.*

Nm:EMERSON2(946963), Pg:38.2

Deed Book 41978 Pg 477

STATE OF GEORGIA
COUNTY OF FULTON

## DECLARATION OF CONDOMINIUM

## FOR

## OVATION, A CONDOMINIUM

THIS DECLARATION is made on the date set forth below by BP Apartments Holdings, LLC, a Delaware limited liability company (hereinafter referred to as "Declarant");

### WITNESSETH

WHEREAS, Declarant is the owner of the real property that is located in Fulton County, Georgia and is described in Exhibit "A" attached hereto and incorporated herein by this reference;

WHEREAS, a plat of survey related to the Condominium prepared by Lowe Engineers, Inc., dated *February 14, 2006* was filed in Condominium Plat Book *17* , Page(s) *13-16* Fulton County, Georgia Records;

WHEREAS, floor plans relating to the Condominium prepared by The Preston Partnership, LLC and Corcoran, Neslon Nardone Associates were filed in Condominium Floor Plan Book *32* , Page(s) *497-528* of the Fulton County, Georgia Records;

WHEREAS, Declarant desires to subject the real property described in Exhibit "A" hereto, including the improvements thereof, to the provisions of this Declaration and to the Georgia Condominium Act; and

NOW, THEREFORE, Declarant hereby declares that the real property described in Exhibit "A" of this Declaration, including the improvements located thereon, is hereby submitted and made subject to the form of ownership set forth in the Georgia Condominium Act, and is hereby subjected to the provisions of this Declaration. By virtue of the recording of this Declaration, said property shall be held, sold, transferred, conveyed, used, occupied, and mortgaged or otherwise encumbered subject to provisions of the Georgia Condominium Act and the covenants, conditions, restrictions, easements, assessments, and liens set forth in this Declaration, which are for the purpose of protecting the value and desirability of, and which shall run with the title to, the real property subject to this Declaration, and shall be binding on all persons having any right, title or interest in all or any portion of the real property subject to this Declaration, their respective heirs, legal representatives, successors, successors-in-title and assigns, and shall be for the benefit of all owners of the property subject to this Declaration.

Deed Book 41978 Pg 478

## TABLE OF CONTENTS

1. NAME. ............................................................................................................ 1
2. DEFINITIONS. ................................................................................................ 1
3. LOCATION, PROPERTY DESCRIPTION, PLATS AND PLANS ................ 4
4. UNITS AND BOUNDARIES ........................................................................... 5
5. COMMON ELEMENTS .................................................................................. 6
6. LIMITED COMMON ELEMENTS .................................................................. 7
7. ASSOCIATION MEMBERSHIP AND ALLOCATION OF VOTES ............... 8
8. ALLOCATION OF LIABILITY FOR COMMON EXPENSES ....................... 8
9. ASSOCIATION RIGHTS AND RESTRICTIONS .......................................... 9
10. ASSESSMENTS ............................................................................................ 10
11. INSURANCE ................................................................................................. 14
12. REPAIR AND RECONSTRUCTION. .......................................................... 17
13. ARCHITECTURAL CONTROLS ................................................................. 18
14. USE RESTRICTIONS .................................................................................. 22
15. LEASING ..................................................................................................... 31
16. TRANSFER OR SALE OF UNITS .............................................................. 34
17. MAINTENANCE RESPONSIBILITY .......................................................... 34
18. MORTGAGEE'S RIGHTS ............................................................................ 38
19. GENERAL PROVISIONS ............................................................................ 40
20. EMINENT DOMAIN .................................................................................... 45
21. EASEMENTS ............................................................................................... 45
22. AMENDMENTS ........................................................................................... 48
23. SEVERABILITY ........................................................................................... 50
24. DECLARANT RIGHTS ................................................................................ 50
25. PREPARER .................................................................................................. 50

**EXHIBITS**

DESCRIPTION OF SUBMITTED PROPERTY ................................................"A"

UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS AND
LIABILITIES FOR COMMON EXPENSES ......................................................"B"

PARKING SPACE ASSIGNMENTS .................................................................."C"

STORAGE SPACE ASSIGNMENTS.................................................................."D"

BYLAWS .........................................................................................................."E"

Nm:EMERSON2(946963), g:38,4

Deed Book 41978 Pg 479

## DECLARATION OF CONDOMINIUM

### FOR

### OVATION, A CONDOMINIUM

1.      NAME.

The name of the condominium is Ovation, a Condominium (hereinafter sometimes called "Ovation" or the "Condominium," as further defined herein), which condominium is hereby submitted by Declarant to the Georgia Condominium Act, O.C.G.A. § 44-3-70, *et seq.*, as such Act may be amended from time to time.

2.      DEFINITIONS.

Generally, terms used in this Declaration, the Bylaws, and the Articles of Incorporation shall have their normal, generally accepted meanings or the meanings given in the Act or the Georgia Nonprofit Corporation Code. Unless the context otherwise requires, certain terms used in this Declaration, the Bylaws and the Articles of Incorporation shall be defined as follows:

(a)      Act shall mean the Georgia Condominium Act, O.C.G.A. § 44-3-70, *et seq.*, as such Act may be amended from time to time.

(b)      Architectural Control Committee or ACC shall mean the committee established to exercise the architectural review powers set forth in Paragraph 13 hereof, which shall be the Board of Directors of the Association unless by resolution the Board appoints a separate Architectural Control Committee.

(c)      Area of Common Responsibility shall mean and refer to the Common Elements, together with those areas, if any, which by the terms of this Declaration or by contract or agreement with any other Person, become the responsibility of the Association.

(d)      Articles or Articles of Incorporation shall mean the Articles of Incorporation of Ovation Condominium Association, Inc., which have been filed with the Secretary of State of the State of Georgia.

(e)      Association shall mean Ovation Condominium Association, Inc., a Georgia nonprofit corporation, its successors or assigns.

(f)      Board or Board of Directors shall mean the body responsible for management and operation of the Association.

(g)      Building shall mean that certain 19 story building having an address of 3040 Peachtree Road, Atlanta, Georgia, Atlanta, Georgia 30305.

(h)      Bylaws shall mean the Bylaws of Ovation Condominium Association, Inc., attached to this Declaration as Exhibit "E" and incorporated herein by this reference.

(i)      Common Elements shall mean those portions of the property subject to this Declaration, which are not included within the boundaries of a Unit, as more particularly described in this Declaration.

Nm:EMERSON2(946963),  Pg:38,5

Deed Book 41978 Pg 480

(j)     Common Expenses shall mean the expenses incurred or anticipated to be incurred by the Association for the general benefit of the Condominium, including, but not limited to, assessments owed to the Master Association, those expenses incurred for maintaining, repairing, replacing, and operating the Common Elements, and those expenses required under the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement.

(k)     Condominium shall mean: all that property described in Exhibit "A" attached hereto and incorporated herein by this reference, submitted to the provisions of the Act by this Declaration.

(l)     Condominium Instruments shall mean this Declaration and all exhibits to this Declaration, including the Bylaws of the Association, and the Survey and Floor Plans, all as may be supplemented or amended from time to time.

(m)     Contractor shall mean any Person, firm, partnership, corporation, association, or other organization that is engaged in the business of designing, developing, constructing, or selling dwellings or the alteration of or addition to an existing dwelling, repair of a new or existing dwelling, or construction, sale, alteration, addition, or repair of an appurtenance to a new or existing dwelling, including, but not limited to, Declarant. The term includes:

   (i)     An owner, officer, director, shareholder, partner, or employee of the contractor;

   (ii)     Subcontractors and suppliers of labor and materials used by a contractor in a dwelling; and

   (iii)     A risk retention group registered under applicable law, if any.

(n)     Declarant shall mean BP Apartments Holdings, LLC, a Delaware limited liability company, its respective successors-in-title and assigns and any other Person or entity as further set forth in Section 44-3-71(13) of the Act, provided that such successors-in-title and/or assigns are designated in writing by Declarant as a successor-in-title and/or assign of the rights of Declarant set forth herein. The expiration of the Declarant Control Period shall not alter the status of BP Apartments Holdings, LLC, as the Declarant herein.

(o)     Declarant Control Period shall mean the time period in which the Declarant has the right to appoint directors and officers of the Association under Article III, Part A, Section 2 of the Bylaws.

(p)     Declarant's Easement Area shall mean that certain area, as shown on the Floor Plans, that Declarant has the right to use exclusively for any purpose it deems appropriate as set forth in Paragraph 21(f).

(q)     Domestic Partner shall mean any adult who cohabitates with an Owner and who has been designated as the Owner's Domestic Partner in a written statement, signed by the Owner and filed with the Association's secretary. A person shall no longer be a Domestic Partner upon the secretary's receipt of a written termination notice, signed by either the Owner or the Domestic Partner.

(r)     Electronic Document shall mean information created, transmitted, received or stored by electronic means and retrievable in human perceivable form including, but not limited to, e-mail, web pages, electronic documents, and facsimile transmissions.

(s)     Electronic Signature shall mean a signature created, transmitted, received or stored by electronic means and includes, but is not limited to, a Secure Electronic Signature.

- 2 -

Nm:EMERSON2(946963), 3:38,6

Deed Book 41978 Pg 481

(t)     Eligible Mortgage Holder shall mean those holders of first Mortgages secured by Units in the Condominium who have requested notice of certain items as set forth in this Declaration.

(u)     Floor Plans shall mean the floor plans for Ovation, a Condominium, filed in the condominium file cabinet of the Official Records.

(v)     Limited Common Elements shall mean a portion of the Common Elements reserved for the exclusive use of those entitled to occupy one (1) or more, but less than all, Units, as more particularly set forth in this Declaration.

(w)     Maintenance Manual shall mean those certain maintenance criteria, maintenance manuals, and warranty requirements for the Building provided by Declarant to the Association in accordance with subparagraph 17(f)(ii) hereof.

(x)     Majority shall mean those eligible votes, Owners, or other group as the context may indicate totaling more than fifty percent (50%) of the total eligible number.

(y)     Master Association shall mean Buckhead Plaza Owners Association, Inc. a Georgia nonprofit corporation, its successors or assigns.

(z)     Master Covenants shall mean that certain Declaration of Covenants, Conditions, Restrictions and Easements by SP one Buckhead Plaza LLC, a Delaware limited liability company, Stafford Plaza, LLC, a Georgia limited liability company, and TCR BP Residential Limited Partnership, a Texas limited partnership, dated April 28, 2004, and filed for record on April 30, 2004 in Deed Book 37495, Page 479, Fulton County, Georgia records.

(aa)     Mortgage shall refer to any mortgage, deed to secure debt, deed of trust, or other transfer or conveyance for the purpose of securing the performance of an obligation including, but not limited to, a transfer or conveyance of fee title for such purpose.

(bb)     Mortgagee or Mortgage Holder shall mean the holder of any Mortgage.

(cc)     Occupant shall mean any Person staying overnight in a Unit for a total of more than thirty (30) days, either consecutive or nonconsecutive, in any calendar year, regardless of whether such Person is a tenant or the Owner of such Unit.

(dd)     Official Records shall mean the official land records of the Clerk of the Superior Court of Fulton County, Georgia.

(ee)     Owner shall mean the record titleholder of a Unit within the Condominium, but shall not include a Person who is only a Mortgage holder.

(ff)     Parking and Easement Agreement shall mean that certain Parking and Easement Agreement for Buckhead Village by and between TCR BP Residential Limited Partnership, a Texas limited partnership, and Stafford Plaza, LLC, a Georgia limited liability company, dated April 28, 2004, and filed for record on April 30, 2004 in Deed Book 37495, Page 681, Fulton County, Georgia records.

(gg)     Parking Facility shall have the same meaning as set forth in Article I, Section 1.2 of the Parking and Easement Agreement.

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), ᵃ⁻ ᵍ:38,7

Deed Book 41978 Pg   482

(hh)    Parking Facility Expenses shall have the same meaning as set forth in Article 3 of the Parking and Easement Agreement.

(ii)    Person shall mean any individual, corporation, firm, association, partnership, trust, or other legal entity.

(jj)    Secure Electronic Signature shall mean an electronic or digital method executed or adopted by a Person with the intent to be bound by or to authenticate a record, which is unique to the Person using it, is capable of verification, is under the sole control of the Person using it, and is linked to data in such a manner that if the data is changed, the electronic signature is invalidated.

(kk)    Survey shall mean the plat of survey for Ovation, a Condominium, filed in the condominium plat book of the Official Records.

(ll)    Telecommunications Activity shall have the same meaning as more specifically set forth in subparagraph 21(g)(ii) hereof.

(mm)    Telecommunications Easement shall have the same meaning as more specifically set forth in subparagraph 21(g)(ii) hereof.

(nn)    Telecommunications Easement Area shall collectively refer to that portion of the rooftop area of the Building as designated on the Floor Plans, the airspace to a height of fifteen feet (15') above such rooftop area, and such area in the elevator machine rooms, the master telecommunications room located in the parking deck, the vertical and horizontal chase space between such areas in the Common Elements and such other portions of the Common Elements that Declarant and its successors-in-title, assigns, and Permittees need in order to install, operate, maintain and connect Telecommunications Equipment and to utilize the Telecommunications Easement.

(oo)    Telecommunications Equipment shall have the same meaning as more specifically set forth in subparagraph 21(g)(ii) hereof.

(pp)    Total Association Vote shall mean all of the eligible votes attributable to members of the Association (including votes attributable to the Declarant), and the consent of Declarant for so long as Declarant owns a Unit primarily for the purpose of sale.

(qq)    Two Buckhead Plaza Covenants shall mean that certain Declaration of Covenants, Conditions, Restrictions and Easements for Two Buckhead Plaza by Stafford Plaza, LLC, a Georgia limited liability company, and TCR BP Residential Limited Partnership, a Texas limited partnership, dated April 28, 2004, and filed for record on April 30, 2004 in Deed Book 37495, Page 598, Fulton County, Georgia records.

(rr)    Unit shall mean that portion of the Condominium intended for individual ownership and use as more particularly described in this Declaration and shall include the undivided ownership in the Common Elements assigned to the Unit by this Declaration.

3.    LOCATION, PROPERTY DESCRIPTION, PLATS AND PLANS

The Condominium subject to this Declaration and the Act is located in Land Lot 99 of the 17th District of Fulton County, Georgia, being more particularly described in Exhibit "A" attached to this Declaration, which exhibit is specifically incorporated herein by this reference. The Survey and Floor Plans relating to the Condominium will be filed in the Official Records at the time the Condominium is

- 4 -

Nm:EMERSON2(946963), ˥˥:38.8

Deed Book 41978 Pg    483

submitted to this Declaration.  The Survey and Floor Plans are incorporated herein by reference as fully as if the same were set forth in their entirety herein.

So long as Declarant owns a Unit, Declarant reserves the right, but shall have no obligation, to make improvements and changes to all or part of the Common Elements and the Units owned by Declarant (other than changes to the location of Unit boundaries unless expressly permitted herein), including, without limitation, addition, realignment and renumbering of parking spaces, addition, reconfiguration and renumbering of storage spaces, renovation and installation of changes to utility systems and facilities, rearrangement and installation of security and refuse facilities, work relating to Building exteriors, and extension of the drives and utility lines and pipes located on the Condominium.

4.    UNITS AND BOUNDARIES.

The Condominium will be divided into two hundred sixty-seven (267) separate Units, and Common Elements, some of which will be assigned as Limited Common Elements.  Each Unit consists of a dwelling space and its appurtenant percentage of undivided interest in the Common Elements.  Each Unit shall be conveyed as a separately designated and legally described expressly freehold estate subject to the Act and the Condominium Instruments.  The Units are depicted on the Survey and the Floor Plans.  Each Unit includes that part of the structure that lies within the following boundaries:

(a)    Vertical Boundaries.  The perimetrical or vertical boundaries of each Unit shall be the vertical planes formed by the outermost surface of the studs in the walls separating the Unit from the exterior wall of the Building and the walls separating the Unit from the hallway of the floor on which the Unit is located in the Building.  With respect to the common wall assembly located between the Units, the perimetrical or vertical boundary of the Units served thereby shall be the centerline of such wall assembly.

(b)    Horizontal Boundaries.

(i)    If the Unit is located on the uppermost residential floor of the Building, the upper horizontal boundary of such Unit shall be the vertical plane formed by the uppermost surface of the wallboard or other material comprising the ceiling of the Unit, with such material constituting part of the Unit.  The lower horizontal boundary of such Unit shall be the vertical plane formed by the lowermost surface of the concrete slab located between the flooring of such Unit and the ceiling of the Unit located below.

(ii)    If the Unit is located on the lowermost residential floor of the Building, the upper horizontal boundary of such Unit shall be the vertical plane formed by the uppermost surface of the wallboard or other material comprising the ceiling of the Unit, with such material constituting part of the Unit.  The lower horizontal boundary of such Unit shall be the vertical plane formed by the uppermost surface of the concrete slab located between the flooring of such Unit and the ceiling of the Common Elements located below.

(iii)    If the Unit is not located on the uppermost or lowermost residential floors of the Building, the upper horizontal boundary of such Unit shall be the vertical plane formed by the uppermost surface of the wallboard or other material comprising the ceiling of the Unit, with such material constituting part of the Unit.  The lower horizontal boundary of such Unit shall be the vertical plane formed by the lowermost surface of the concrete slab located between the flooring of such Unit and the ceiling of the Unit located below.

(c)    Additional Information to Interpret Unit Boundaries.  Entry doors and exterior glass surfaces, including, but not limited to, windows and glass doors, and that portion of the glass wall system

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), ☐:38,9

Deed Book 41978 Pg 484

serving the Unit shall be included within the boundaries of the Unit. Heating, air conditioning and ventilation systems serving a single Unit (including any part of any such system located outside the boundaries of the Unit), all duct work for heating and air conditioning systems and appliances and plumbing fixtures within a Unit shall be part of the Unit.

If any chutes, flues, ducts, conduits, wires, pipes or other apparatus lies partially within and partially outside of the designated boundaries of the Unit, any portion thereof which serves only that Unit shall be deemed to be a part of that Unit, while any portions thereof which serve more than one (1) Unit or any portion of the Common Elements shall be deemed a part of the Common Elements.

In interpreting deeds and Floor Plans, the existing physical boundaries of a Unit as originally constructed or of a Unit reconstructed in substantial accordance with the original Floor Plans thereof shall be conclusively presumed to be its boundaries rather than the metes and bounds expressed in any deed or Floor Plan, regardless of settling or lateral movement of the Building in which the Unit was located, and regardless of minor variance between the boundaries shown on the Floor Plans or in a deed and those of the Unit.

The ownership of each Unit shall include, and there shall pass with each Unit, whether or not separately described in the conveyance thereof, that percentage of the right, title and interest in the Common Elements attributable to such Unit, together with membership in the Association and an undivided interest in the funds and assets held by the Association.

(d)   Unit Measurements.   Each Owner, by acceptance of a deed or other conveyance of a Unit, understands and agrees that there are numerous methods for calculating the square footage of a Unit, and that depending on the method of calculation, the square footage of the Unit may vary. Additionally, as a result of in the field construction, other permitted changes to the construction of Unit, and settling and shifting of improvements, actual square footage of a Unit may also be affected. By accepting title to a Unit, the applicable Owner(s) shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed at any time prior to closing, whether included as part of Declarant's promotional materials or otherwise. Without limiting the generality of the foregoing, Declarant does not make any representation or warranty as to the actual size, dimensions (including ceiling heights) or square footage of any Unit, and each Owner shall be deemed to have fully waived and released any such warranty.

5.   COMMON ELEMENTS.

The Common Elements consist of all portions of the Condominium not located within the boundaries of a Unit. Ownership of the Common Elements shall be by the Owners as tenants-in-common. The percentage of undivided interest in and to the Common Elements attributable to each Unit is set forth in Exhibit "B" attached hereto and incorporated herein by this reference. Such percentages of undivided interest may be altered only by the consent of all Owners and Mortgagees (or such lesser number of Owners and Mortgagees as may hereafter be prescribed by the Act) expressed in a duly recorded amendment to this Declaration.

The Common Elements shall remain undivided, and no Owner or any other Person shall bring any action for partition or division of the whole or any part thereof except as provided in the Act. Except as provided for Limited Common Elements or as otherwise provided herein, each Owner and the Association may use the Common Elements for the purposes for which they are intended, but no such use shall enter or encroach upon the lawful rights of the other Owners.

- 6 -

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963),  a:38,10

Deed Book 41978 Pg  485

6.   LIMITED COMMON ELEMENTS.

(a)   The Limited Common Elements located on the Condominium and the Unit(s) to which they are assigned are as follows, and may be more specifically shown on the Floor Plans::

(i)   hallways, corridors, and stairs serving more than one (1) but less than all Units, as shown on the Floor Plans, are assigned as Limited Common Elements to the Units that they serve;

(ii)   the portion of the Common Elements on which there is located any portion of the air conditioning or heating system exclusively serving a particular Unit or Units is assigned as a Limited Common Element to the Unit or Units so served;

(iii)   any utility meter which serves only one (1) Unit is assigned as a Limited Common Element to the Unit so served;

(iv)   any balcony attached to and serving only one (1) Unit is assigned as a Limited Common Element to the Unit to which it is attached and which it serves;

(v)   a Unit may be assigned one (1) or more parking spaces, which are assigned on Exhibit "C" attached hereto and incorporated herein by this reference and shown on the Floor Plans as a Limited Common Element, assigned to the Unit.  Parking spaces may be initially assigned or reassigned by amendment to this Declaration as provided in subparagraphs (b) and (c) below;

(vi)   a Unit may be assigned one (1) or more storage spaces, which are assigned on Exhibit "D" attached hereto and incorporated herein by this reference and shown on the Floor Plans as a Limited Common Element, assigned to the Unit.  Storage spaces may be initially assigned or reassigned by amendment to this Declaration as provided in subparagraphs (b) and (c) below; and

(vii)   each Unit is assigned one (1) mailbox or mail slot, to be initially assigned in the sole discretion of the Declarant.

(b)   The Association's Board of Directors, without need for a membership vote, is hereby authorized to assign and to reassign Limited Common Elements and Common Elements not previously assigned, provided that any such assignment or reassignment shall be made in accordance with the provisions of Section 44-3-82(b) and (c) of the Act.  A Common Element not previously assigned as a Limited Common Element may be so assigned and a Limited Common Element may be reassigned by the Board, without the need for a vote of the Association, upon written application to the Association by the Owner or Owners for whose exclusive use such Common Element is requested or whose use of the Limited Common Element previously assigned is directly affected.  Upon such application, the Association shall prepare and execute an amendment to the Declaration assigning the Common Element as a Limited Common Element or reassigning the Limited Common Element, which amendment shall be executed by the Owner or Owners making such application.  Such amendment shall be delivered and become effective as provided in Section 44-3-82 of the Act.  For so long as the Declarant owns a Unit primarily for the purpose of sale, an amendment to assign a Common Element, not previously assigned as a Limited Common Element shall be executed by the officers of the Association, if the request is made by Declarant.  The Board has the right to approve or disapprove any such request made by any Person other than Declarant.

- 7 -

Nm:EMERSON2(946963)   q:38,11

Deed Book 41978 Pg 486

(c)     For so long as Declarant owns any Unit primarily for the purpose of sale, Declarant shall have the right to sell to Owners one (1) or more parking spaces and storage spaces to be assigned as Limited Common Elements pursuant to subparagraphs (a) and (b) above. The proceeds of the sale of parking spaces and storage spaces as Limited Common Elements shall belong to the Declarant.

7.     ASSOCIATION MEMBERSHIP AND ALLOCATION OF VOTES.

All Owners, by virtue of their ownership of a fee or undivided fee interest in any Unit in the Condominium, excluding Persons holding such interest under a Mortgage, are members of the Ovation Condominium Association, Inc., and, except as otherwise provided herein or in the Bylaws, shall be entitled to vote on all matters upon which members of the Association are entitled to vote pursuant to the Declaration and in accordance with the Bylaws. Subject to the provisions of the Condominium Instruments, the Owner or collective Owners of a Unit shall be entitled to one (1) equally weighted vote for such Unit.

Furthermore, each Owner, by acceptance of a deed to a Unit, acknowledges that, in addition to being subject to and bound by the Condominium Instruments, he or she is subject to the Master Covenants, the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement, and further acknowledges that the Association is a member of and subject to assessment by the Master Association.

8.     ALLOCATION OF LIABILITY FOR COMMON EXPENSES.

(a)     Except as provided below or elsewhere in the Act or Condominium Instruments, the amount of all Common Expenses shall be assessed against all the Units in accordance with the percentage of undivided interest in the Common Elements appurtenant to the Unit as set forth in Exhibit "B" attached hereto and incorporated herein by this reference.

(b)     The Board of Directors shall have the power to levy special assessments against Units pursuant to this Paragraph and to Section 44-3-80(b) of the Act as, in its discretion, it shall deem appropriate. Failure of the Board of Directors to exercise its authority under this Paragraph shall not be grounds for any action against the Association or the Board of Directors and shall not constitute a waiver of the Board's right to exercise its authority under this Paragraph in the future with respect to any expenses, including an expense for which the Board has not previously exercised its authority under this Paragraph.

(i)     Any Common Expenses benefiting less than all of the Units or significantly disproportionately benefiting all Units (such as Common Expenses benefiting the Unit or Units to which certain Limited Common Elements have been assigned, as set forth in Paragraph 6 hereof) may be specially assessed equitably among all of the Units that are benefited according to the benefit received. Except for expenses for maintenance, repair or replacement of Limited Common Elements, which may be specially assessed, expenses incurred for the maintenance, repair or replacement of the Area of Common Responsibility, shall not be specially assessed.

(ii)     Any Common Expenses occasioned by the conduct of less than all of those entitled to occupy all of the Units or by the Occupant(s), licensees or invitees of any such Unit or Units may be specially assessed against such Unit or Units.

(c)     The Condominium currently is served by a common water meter. The Declarant or the Board shall have the authority to install submeters and assess individual Unit utilities usage charges as special assessments as provided in subparagraph (b)(i) above. This shall include the right to add a charge for the cost of overhead for such submetering, against individual Units and/or to install separate utility meters for the Units.

- 8 -

Nm:EMERSON2(946963)   q:38,12

Deed Book 41978 Pg 487

9.    ASSOCIATION RIGHTS AND RESTRICTIONS.

In addition to and not in limitation of all other rights it may have, the Association, acting through its Board of Directors, shall have the right and authority:

(a)    to enter into Units for maintenance, emergency, security, or safety purposes, which right may be exercised by the Association's Board of Directors, officers, agents, employees, managers, and all police officers, firemen, ambulance personnel, and similar emergency personnel in the performance of their respective duties.  Except in an emergency situation, entry shall be only during reasonable hours and after reasonable notice to the Owner or Occupant of the Unit.  For the purposes of this Paragraph, an emergency justifying immediate entry into a Unit shall include, but not be limited to, the following situations:  a water or other utility leak, fire, strong foul odor, obvious insect infestation or sounds indicating that a person or animal might be injured or sick and require immediate medical attention.  No one exercising the rights granted in this subparagraph shall be liable for trespass, damages, or in any other manner by virtue of exercising such rights, except as provided in the Act.  The failure to exercise the rights herein or to exercise said rights in a timely manner shall not create liability to any of the above-referenced parties, it being agreed that no duty to enter a Unit shall exist;

(b)    to make and to enforce reasonable rules and regulations governing the use of the Condominium, including the Units, Limited Common Elements, and Common Elements;

(c)    to enforce use restrictions, other Declaration and Bylaws provisions, and rules and regulations by the imposition of reasonable monetary fines and suspension of use and voting privileges as provided in Section 44-3-76 of the Act, as amended;

(d)    to grant and accept permits, licenses, utility easements, leases, and other easements;

(e)    to control, manage, operate, maintain, improve and replace all portions of the Area of Common Responsibility;

(f)    to represent and act on behalf of the Owners in the event of damage or destruction as a result of casualty loss in accordance with the provisions of the Act and Paragraph 12 of this Declaration;

(g)    to represent and act on behalf of the Owners in the event of any loss resulting from condemnation or eminent domain in accordance with the provisions of the Act and this Declaration;

(h)    to acquire, hold, and dispose of tangible and intangible personal property and real property;

(i)    to collect security deposits in reasonable amounts, as determined by the Board of Directors in its sole discretion, to protect against any damage to the Condominium, including, without limitation, damage resulting from: moving in or out of a Unit; the transportation and use of construction materials in the Condominium; and the alteration, modification, or addition to a Unit and any Limited Common Element appurtenant thereto.  Costs for repair of such damage may be deductible from the security deposit and any additional expenses may be specifically assessed against the Unit under subparagraph 8(b)(ii) above;

(j)    to approve contractors or subcontractors who have access to the Condominium for the purpose of making repairs or improvements to Units based on rules and regulations promulgated and adopted by the Board which may include, without limitation: financial stability of the contractors and/or subcontractors; history of compliance with the Condominium Instruments and rules and regulations of the Association; and other factors that may be reflective of quality and ability.  The Board may also impose insurance requirements and collect other non-refundable fees for use of elevators and the trash receptacle;

- 9 -

Nm:EMERSON2(946963),   a:38,13

Deed Book 41978 Pg 488

   (k)   at the sole expense of the Association, without need for a membership vote, and without the written consent of any affected Owner, to relocate any portion of the air conditioning, heating, plumbing, ventilating, exhaust, electrical, or telecommunications system serving a particular Unit, provided that after such relocation, the system serving the Unit functions at least as well and at no greater cost to the Owner as existed prior to the relocation (such rights shall also be reserved to the Declarant);

   (l)   to close permanently or temporarily any portion of the Common Elements (excluding the Limited Common Elements, and any Common Elements the use of which is reasonably necessary for access to or from a Unit) with thirty (30) days prior notice to all Owners, except that, in emergency situations requiring a temporary closing, prior notice shall not be required so long as notice is given within three (3) days after the closing explaining the reason for the closing. Notwithstanding the above, the Owners may re-open closed Common Elements by a Majority vote of the Total Association Vote, cast at a duly called special or annual meeting;

   (m)   to enter into joint agreements and contracts with other property owners for the provision of services, including, without limitation, management, landscaping, porter, concierge, and property monitoring services;

   (n)   to pay assessments to the Master Association as provided in the Master Covenants;

   (o)   to appoint a representative to the Master Association to represent the Condominium in accordance with the Master Covenants and the bylaws of the Master Association; and

   (p)   to pay assessments to the Manager (as such term is defined in the Two Buckhead Plaza Covenants) as provided in the Two Buckhead Plaza Covenants;

   (q)   to pay its pro-rata share of the Parking Facility Expenses in accordance with Article III of the Parking and Easement Agreement.

10.   ASSESSMENTS.

   (a)   Purpose of Assessment.   The Association shall have the power to levy assessments as provided herein and in the Act. The assessments for Common Expenses provided for herein shall be used for the general purposes of promoting the recreation, health, safety, welfare, common benefit, and enjoyment of the Owners and Occupants of Units in the Condominium as may be more specifically authorized from time to time by the Board.

   (b)   Creation of the Lien and Personal Obligation For Assessments.   Each Owner of any Unit, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Association: (i) annual assessments or charges; (ii) special assessments, such assessments to be established and collected as hereinafter provided; and (iii) specific assessments against any particular Unit that are established pursuant to the terms of this Declaration, including but not limited to reasonable fines imposed in accordance with the terms of this Declaration.

   All such assessments, together with charges, interest, costs, and reasonable attorneys' fees actually incurred, and if the Board so elects, rents, in the maximum amount permitted by the Act, shall be a charge on the Unit and shall be a continuing lien upon the Unit against which each assessment is made. Such amounts shall also be the personal obligation of the Person who was the Owner of such Unit at the time when the assessment fell due. Each Owner and his or her grantee shall be jointly and severally liable for all assessments and charges due and payable at the time of any conveyance.

- 10 -

434858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), 3:38,14

Deed Book 41978 Pg   489

Assessments shall be paid in such manner and on such dates as may be fixed by the Board of Directors.  Unless otherwise provided, the annual assessments shall be paid in equal monthly installments due on the first day of each calendar month.  No Owner may exempt him or herself from liability for or otherwise withhold payment of assessments for any reason whatsoever, including, but not limited to, nonuse of the Common Elements, the Association's failure to perform its obligations required hereunder, or an inconvenience or discomfort arising from the Association's performance of its duties.  The lien provided for herein shall have priority as provided in the Act.  Notwithstanding anything to the contrary stated herein, the Declarant shall have no obligation to fund budgetary deficits of the Association.

The Board of Directors shall have the right to: (i) not spend the full amount budgeted for any particular line item in the budget; (ii) spend more than what has been budgeted; and (iii) shift revenues within the budget from one line to another.  Notwithstanding anything to the contrary stated herein, during the Declarant Control Period, the Declarant or the Declarant appointed Board of Directors shall be authorized to unilaterally reduce the amount of the annual assessments owed on Units without the necessity of a vote of the Owners to reflect cost savings that were not contemplated at the time the initial estimated operating budget of the Association was developed.

(c)      Delinquent Assessments.  All assessments and related charges not paid on or before the due date shall be delinquent, and the Owner shall be in default.

(i)      If any monthly installment of annual assessments or any part thereof is not received in full by the tenth (10th) day of the month or if any other charge is not paid within ten (10) days of the due date, a late charge equal to the greater of Ten Dollars ($10) or ten percent (10%) of the amount not paid, or such higher amounts as may be authorized by the Act, may be imposed without further notice or warning to the delinquent Owner and interest at the rate of ten percent (10%) per annum or such higher rate as may be permitted by the Act shall accrue from the due date.

(ii)      If part payment of assessments and related charges is made, the amount received may be applied first to costs and reasonable attorneys' fees actually incurred,. then to late charges, then to interest, then to delinquent assessments, and then to current assessments.

(iii)      If assessments, fines or other charges or any part thereof due from an Owner remain delinquent and unpaid for a period greater than thirty (30) days from the date due, a notice of delinquency may be given to that Owner stating that if the assessment, fine or charge remains delinquent for more than ten (10) days from the date of the notice of delinquency, the Board of Directors may accelerate and declare immediately due all of that Owner's unpaid installments of the annual assessment and of any special assessment without any further notice being given to the delinquent Owner.  Upon acceleration, that Owner shall thereby lose the privilege of paying the annual assessment in monthly installments for that fiscal year.

(iv)      If assessments and other charges or any part thereof remain unpaid more than thirty (30) days after they become delinquent, the Association, acting through the Board of Directors, may institute suit to collect all amounts due pursuant to the provisions of the Declaration, the Bylaws, the Act and Georgia law, including reasonable attorneys' fees actually incurred, and suspend the Owner's and/or Occupant's right to vote and to use the Common Elements, including the right to bring or park vehicles on the Common Elements or have guests bring or park vehicles on the Common Elements.  However, the Board may not limit pedestrian, medical, fire, police or other health, safety, service or emergency vehicle ingress or egress to or from the Unit or deny necessary parking of clearly and properly identified handicapped vehicles used by handicapped Owners or Occupants protected by the Fair Housing Amendments Act of 1988.  Prior to suspending parking privileges, the Association shall provide the delinquent Owner or Occupant written notice of its

Nm:EMERSON2(946963),  q:38,15

Deed Book 41978 Pg   490

intention to do so, sent by certified mail not less than ten (10) days prior to the date of such suspension.

(v)        If any assessment or other charge is delinquent for thirty (30) days or more, and the Association has obtained judgment(s) totaling more than Seven Hundred Fifty Dollars ($750) against the Owner or encumbering the Unit, then, in addition to all other rights provided under Georgia law and herein, the Association shall have the right, in compliance with any requirements set forth in the Section 44-3-76 of the Act, to suspend water, electricity, gas, heat, air conditioning, cable or satellite television, internet access or other internet-based services, or any other or utility service to the Unit paid for as a Common Expense by the Association.  Any costs incurred by the Association in discontinuing and/or reconnecting any utility or service, including reasonable attorneys' fees actually incurred, shall be an assessment against the Unit. The utility or service shall not be required to be restored until the judgment(s) is (are) paid in full, at which time the Association shall make arrangements for restoration of the utility or service.  An Owner whose utility or service has been suspended hereunder shall not be entitled to use any such utility or service from any source, and any such unauthorized use shall be considered a theft of services under O.C.G.A. Section 16-8-5.

Notwithstanding the above, if cable television, satellite, or internet service or any other service not constituting a utility is provided by the Association as a Common Expense, that service may be suspended upon ten (10) days written notice to the delinquent Owner, without obtaining any judgment against the Owner or encumbering the Unit.  Enforcement under this subparagraph is not dependent upon or related to other restrictions and/or other actions.

(d)        Computation of Operating Budget and Assessment.  It shall be the duty of the Board at least twenty-one (21) days prior to the Association's annual meeting to prepare and deliver to each member a budget covering the estimated costs of operating the Condominium during the coming year, which shall include any assessments to be paid to the  Master Association as set forth in the Master Covenants, and any assessments to be paid as set forth in the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement. The Board shall cause the budget and notice of the assessments to be levied against each Unit for the following year. The budget and the assessment shall become effective unless disapproved at a duly called and constituted annual meeting of the Association by a vote of a Majority of the Total Association Vote; provided, however, if a quorum is not obtained at the annual meeting, the budget shall become effective even though a vote to disapprove the budget could not be called at this meeting.

Notwithstanding the foregoing, in the event that the membership disapproves the proposed budget or the Board fails for any reason to determine the budget for the succeeding year, then and until such time as a budget shall have been determined as provided herein, the budget in effect for the current year shall continue for the succeeding year. In such case, the Board may propose a new budget at any time during the year at a special meeting of the Association. The proposed budget and assessment shall be delivered to the members at least twenty-one (21) days prior to the proposed effective date thereof and at least seven (7) days prior to the special meeting. The approval procedure set forth above for budgets considered at annual meetings shall also apply to budgets considered at special meetings.

Notwithstanding anything to the contrary stated herein, during the Declarant Control Period, Declarant or Declarant-appointed Board of Directors shall be authorized to unilaterally pass a new budget to reflect costs resulting from the addition of a phase or phases to the Condominium or to reflect costs that were not contemplated at the time the initial, estimated operating budget for the Association was developed.

(e)        Special Assessments.  In addition to the annual assessment provided for in subparagraph (b) above, the Board may, at any time, and in addition to any other rights it may have, levy a special assessment

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), q:38,16

Deed Book 41978 Pg 491

against all Owners, notice of which shall be sent to all Owners. Any special assessment (except as provided in subparagraph 8(b) regarding the power to assess specially pursuant to Section 44-3-80(b) of the Act and subparagraph 12(b) herein, regarding repair or reconstruction of casualty damage to or destruction of all or part of the Condominium) which would cause the average total of special assessments levied in one (1) fiscal year to exceed Two Hundred Dollars ($200) per Unit or such higher amount as is authorized by the Act, shall be approved by a Majority of the Total Association Vote prior to becoming effective.

(f)   Capital Reserve Budget and Contribution. The Board of Directors may annually prepare a capital reserve budget that shall take into account the number and nature of replaceable assets, the expected life of each asset, and the expected repair or replacement cost. The Board shall set the required capital reserve contribution, if any, in an amount sufficient to permit meeting the projected capital needs of the Association, as shown on the capital reserve budget, if any, with respect both to amount and timing by equal annual assessments over the period of the budget. The annual capital reserve contribution required, if any, shall be fixed by the Board and included within the budget and assessment as provided in subparagraph (d) of this Paragraph. A copy of the capital reserve budget shall be distributed to each member in the same manner as the operating budget.

(g)   Statement of Account. Any Owner, Mortgagee, or a Person having executed a contract for the purchase of a Unit, or a lender considering a loan to be secured by a Unit, shall be entitled, upon written request, to a statement from the Association setting forth the amount of assessments due and unpaid, including any late charges, interest, fines, or other charges against a Unit. The Association shall respond in writing within ten (10) business days of receipt of the request for a statement; provided, however, the Association may require the payment of a fee, not exceeding Ten Dollars ($10), or such higher amount as may be authorized by the Act, as a prerequisite to the issuance of such a statement. Such written statement shall be binding on the Association as to the amount of assessments due on the Unit as of the date specified therein.

(h)   Surplus Funds and Common Profits. Pursuant to Section 44-3-108 of the Act, common profits from whatever source shall be applied to the payment of Common Expenses. Any surplus funds remaining after the application of such common profits to the payment of Common Expenses shall, at the option of the Board of Directors, either be distributed to the Owners or credited to the next assessment chargeable to the Owners in proportion to the liability for Common Expenses attributable to each Unit, or added to the Association's capital reserve account as set forth in subparagraph (f) above. Notwithstanding the foregoing, any surplus funds remaining after the application of such common profits to the payment of Common Expenses at the end of the first fiscal year (excluding amounts designated for reserves) shall be distributed to the Owners in proportion to the liability for Common Expenses attributable to each Unit.

If the Board of Directors reasonably determines that during a fiscal year there will likely be a surplus of funds at the end of such fiscal year (excluding amounts designated for reserves), the Board may, but shall not be required to, reduce the amount of the annual assessment to be collected from the Owners for the remainder of that fiscal year. Any Owner who has already paid the entire annual assessment at the time of such reduction shall, in the discretion of the Owner, either receive a refund of the overpayment or a credit of the amount of the overpayment towards the annual assessment of the Association for the following fiscal year. Notwithstanding the above, the Association may first apply the amount of any overpayment toward any other amount the Owner may owe to the Association.

(i)   Working Capital Fund. Declarant, on behalf of the Association, may establish a working capital fund to meet unforeseen expenditures or to purchase any additional equipment or services. A non-refundable contribution to the working capital fund of the Association shall be paid by the purchaser of a Unit at the closing of each sale or resale of a Unit in the amount of two (2) months of the general assessment charged to such Unit. Declarant shall not use the working capital funds to defray any of its expenses,

- 13 -

Nm:EMERSON2(946963),  g:38,17

Deed Book 41978 Pg  492

reserve contributions, or construction costs or to make up any budget deficits while it is in control of the Association. Notwithstanding anything to the contrary herein, the contribution to the working capital fund shall not be due from: (i) any grantee who is the Domestic Partner, spouse or former spouse of the grantor; (ii) any grantee that is a wholly-owned entity of the grantor; (iii) any grantee to whom a Unit is conveyed by a will or through the law of intestacy; or (iv) any grantee of a Unit who obtains title pursuant to judicial or nonjudicial foreclosure of any first Mortgage of record or secondary purchase money Mortgage of record (provided that neither the grantee nor any successor grantee on the Mortgage is the seller of the Unit).

11.    <u>INSURANCE</u>.

        The Association, acting through its Board of Directors, shall obtain and maintain at all times, as a Common Expense, insurance as required by Section 44-3-107 of the Act, as amended, and as required herein, and as determined by the Board of Directors with regards to both limits of insurance and coverage. In accordance with the Act, the property insurance shall, at a minimum, afford fire and extended coverage insurance for and in an amount consonant with the full replacement value of the buildings and other structures on the Condominium.  Such coverage shall include all of the Units and the fixtures initially installed therein by Declarant and replacements thereof up to the value of those initially installed by Declarant, but shall not include any improvements or additions (including wall coverings and fixtures) made by or on behalf of any Owner other than those made by Declarant and shall exclude furnishings and other personal property within a Unit.

        All insurance purchased by the Association pursuant to this Paragraph shall run to the benefit of the Association, the Board of Directors, officers, all agents and employees of the Association, the Owners and their respective Mortgagees, and all other Persons entitled to occupy any Unit as their interests may appear. The Association's insurance policy may contain a reasonable deductible, and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the insurance equals at least the replacement cost of the insured property.

        The Board of Directors shall make available for review by Owners a copy of the Association's insurance policy to allow Owners to assess their personal insurance needs and each Owner shall have the right to obtain additional coverage at his or her own expense.

        All insurance coverage for the Association shall be written in the name of the Association as trustee for itself, each of the Owners, and the Mortgagees of Owners, if any.  It shall be the duty of the Board of Directors at least every two (2) years to conduct an insurance review to determine if the policy in force is adequate to meet the needs of the Association and to satisfy the requirements of Section 44-3-107 of the Act, as amended.  Such responsibility may be performed, and shall be deemed reasonably performed, by the Board requesting the Association's insurance agent to verify that insurance policies in existence meet the needs of the Association and satisfy the requirements of Section 44-3-107 of the Act, as amended.

        (a)     The Board of Directors shall utilize commercially reasonable efforts to secure a blanket hazard insurance policy providing "special perils" coverage in an amount equal to full replacement cost, before application of deductibles, of all structures located on the Condominium as required by Section 44-3-107 of the Act.  If "special perils" coverage is not reasonably available at reasonable cost, the Board shall obtain, at a minimum, fire and extended coverage, including coverage for vandalism and malicious mischief, in like amounts.  The Board shall use commercially reasonable efforts to obtain policies that will provide the following:

424858 4 / 10205-003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), q:38,18

Deed Book 41978 Pg 493

(i)   the insurer waives its rights of subrogation of any claims against directors, officers, the managing agent, the individual Owners, Occupants, and their respective household members;

(ii)   any "other insurance" clause contained in the master policy shall expressly exclude individual Owners' policies from its operation;

(iii)   until the expiration of ten (10) days after the insurer gives notice in writing to the Mortgagee of any Unit, the Mortgagee's insurance coverage will not be affected or jeopardized by any act or conduct of the Owner of such Unit, the other Owners, the Board of Directors, or any of their agents, employees, or household members, nor be canceled for nonpayment of premiums;

(iv)   the master policy may not be canceled, substantially modified, or subjected to nonrenewal without at least ten (10) days prior notice in writing to the Board of Directors and all Mortgagees of Units; and

(v)   an agreed value endorsement and an inflation guard endorsement.

(b)   All policies of insurance shall be written with a company licensed to do business in the State of Georgia. The company shall provide insurance certificates to each Owner and each Mortgagee upon request.

(c)   Exclusive authority to adjust losses under policies obtained by the Association shall be vested in the Board of Directors; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related thereto.

(d)   In no event shall the insurance coverage obtained and maintained by the Association hereunder be brought into contribution with insurance purchased by individual Owners or their Mortgagees. Each Owner shall notify the Board of Directors of all structural improvements made by the Owner to his or her Unit. Any Owner who obtains an individual insurance policy covering any portion of the Condominium, other than improvements and betterments made by such Owner at his or her expense and personal property belonging to such Owner, shall file a copy of such individual policy or policies with the Board of Directors within thirty (30) days after the purchase of such insurance. Such Owner shall also promptly notify, in writing, the Board of Directors in the event such policy is cancelled.

(e)   In addition to the insurance required hereinabove, the Board shall obtain as a Common Expense:

(i)   workers' compensation insurance if and to the extent necessary to meet the requirements of law;

(ii)   public liability insurance in amounts no less than required by Section 44-3-107 of the Act, as amended, and officers and directors' liability insurance in such amounts as the Board may determine. The public liability insurance shall contain a cross liability endorsement;

(iii)   fidelity bonds, if reasonably available, covering officers, directors, employees, and other Persons who handle or are responsible for handling Association funds. Such bonds, if reasonably available, shall be in an amount consistent with the best business judgment of the Board of Directors, but in no event less than three (3) months assessments plus a reasonable amount to cover all or a reasonable portion of reserve funds in the custody of the Association at any time during the term of the bond; provided, however, fidelity coverage herein required may

- 15 -

Nm:EMERSON2(946963)    q:38,19

Deed Book 41978 Pg 494

be reduced based on the implementation of financial controls which take one or more of the following forms: (a) the Association or management company, if any, maintains a separate bank account for the working account and the reserve account, each with appropriate access controls and the bank in which funds are deposited sends copies of the monthly bank statements directly to the Association; (b) the management company, if any, maintains separate records and bank accounts for each association that uses its services and the management company does not have the authority to draw checks on, or to transfer funds from, the Association's reserve account; or (c) two (2) members of the Board of Directors must sign any checks written on the reserve account;

(iv)    property insurance covering the Parking Facility against loss in accordance with the terms and conditions of Article V, Section 5.3 of the Parking and Easement Agreement. The premiums for such policy shall be deemed a Parking Facility Expense and subject to the provisions for payment and reimbursement as set forth in Article III, Section 3.4 of the Parking and Easement Agreement; and

(v)    such other insurance as the Board of Directors may determine to be necessary or desirable including, for example coverage of the following types of property contained within a Unit, regardless of ownership: (A) fixtures, improvements and alterations that are part of the building or structure; and (B) appliances, such as those used for refrigerating, ventilating, cooking, dishwashing, laundering, security or housekeeping.

(f)    Insurance carried by the Association as a Common Expense shall not be required to include: (i) any part of a Unit that is not depicted on the original Survey and Floor Plans; or (ii) any part of a Unit that was not included as part of the collateral for the initial loan made for the initial purchase of the Unit, nor shall the Association include public liability insurance for individual Owners for liability arising within the Unit.

(g)    Nothing contained herein gives any Owner or other party a priority over any rights of first Mortgagees as to distribution of insurance proceeds. Any insurance proceeds payable to the Owner of a Unit on which there is a Mortgagee endorsement shall be disbursed jointly to such Owner and the Mortgagee. This is a covenant for the benefit of any such Mortgagee and may be enforced by any such Mortgagee.

(h)    Every Owner shall be obligated to obtain and maintain at all times insurance covering those portions of his or her Unit to the extent not insured by policies maintained by the Association. Upon request by the Board, the Owner shall furnish a copy of such insurance policy or policies to the Association. In the event that any such Owner fails to obtain insurance as required by this subparagraph, the Association may purchase such insurance on behalf of the Owner and assess the cost thereof to the Owner, to be collected in the manner provided for collection of assessments under Paragraph 10 hereof.

(i)    Insurance Deductibles. In the event of an insured loss, any required deductible shall be considered a maintenance expense to be paid by the Person or Persons who would be responsible for such loss in the absence of insurance. If the loss affects more than one (1) Unit or a Unit and the Common Elements, the cost of the deductible may be apportioned equitably by the Board among the parties suffering loss in proportion to each affected owner's portion of the total cost of repair. Notwithstanding the foregoing, if the insurance policy provides that the deductible will apply to each Unit separately or to each occurrence, each Owner shall be responsible for paying the deductible pertaining to his or her Unit, if any. If any Owner or Owners fail to pay the deductible when required under this subparagraph, then the Association may pay the deductible and assess the cost to the Owner or Owners pursuant to Paragraph 8 of this Declaration; provided, however, where the deductible is for insurance required under the Act, no

- 16 -

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963),   :38,20

Deed Book 41978 Pg 495

Owner shall be assigned more than Two Thousand Five Hundred Dollars ($2,500), or such higher amount as authorized by the Act, as the cost of the deductible for any one (1) occurrence.

(j)    Payment of Claims to Delinquent Owners.  Notwithstanding anything to the contrary herein, in the event of an insured loss under the Association's master hazard insurance policy for which the Association receives from the insurer payment for a loss sustained by an Owner who is delinquent in the payment of assessments owed to the Association under Paragraph 10 hereof, then the Association may retain and apply such proceeds to the delinquency.  Any surplus remaining after application of the proceeds to any delinquency shall be paid by the Association to the affected Owner.

(k)    Additional Insurance Requirements.  Insurance for the Condominium maintained by the Association shall also comply with the requirements set forth in (i) Article X of the Master Covenants; (ii) Article X of the Two Buckhead Plaza Covenants; and (iii) Article 5 of the Parking and Easement Agreement.

12.    REPAIR AND RECONSTRUCTION.

In the event of damage to or destruction of all or any part of the Condominium as a result of fire or other casualty, unless eighty percent (80%) of the Owners, including the Owner or Owners of any damaged Unit or Units, vote not to proceed with the reconstruction and repair of the structure, the Board of Directors or its duly authorized agent shall arrange for and supervise the prompt repair and restoration of the structure. In the event of substantial damage or destruction, each holder of a first Mortgage shall be entitled to written notice of the damage, and nothing in these documents shall be construed to afford a priority to any Owner with respect to the distribution of proceeds to any such Unit.

(a)    Cost Estimates.  Immediately after a fire or other casualty causing damage to the Condominium, the Board of Directors shall obtain reliable and detailed estimates of the cost of repairing and restoring the structures (including any damaged Unit) to substantially the condition that existed before such casualty, allowing for any changes or improvements necessitated by changes in applicable building codes. Such costs may also include professional fees and premiums for such bonds as the Board of Directors determines to be necessary.

(b)    Source and Allocation of Proceeds.  If the proceeds of insurance are not sufficient to defray the costs of reconstruction and repair, as determined by the Board of Directors, the additional cost shall be a Common Expense. If, for any reason, the proceeds of insurance are not sufficient to defray the costs of reconstruction and repair, as determined by the Board, the additional costs shall be assessed against the Owners of the Unit(s) damaged in proportion to the damage to the Units or against all Owners, in the case of insufficient funds to cover damage to the Common Elements. This assessment shall not be considered a special assessment as discussed in subparagraph 10(e). If there are surplus funds after repair and reconstruction is completed, such funds shall be common funds of the Association to be used as directed by the Board.

(c)    Floor Plans and Specifications.  Any such reconstruction or repair shall be substantially in accordance with the Floor Plans and specifications under which the Condominium was originally constructed to standard finish so as to exclude any upgrades made to Units, except where changes are necessary to comply with current applicable building codes or where improvements not in accordance with the original Floor Plans and specifications are approved by the Board of Directors. To the extent insurance proceeds are available, the Association may reconstruct or repair Owner improvements damaged as a result of fire or other casualty.

- 17 -

Nm:EMERSON2(946963), Pg:38,21

Deed Book 41978 Pg  496

     (d)    <u>Encroachments</u>.  Encroachments upon or in favor of Units that may be created as a result of such reconstruction or repair shall not constitute a claim or basis for any proceeding or action by the Owner upon whose property such encroachment exists, provided that such reconstruction was substantially in accordance with the architectural plans under which the Condominium was originally constructed.  Such encroachments shall be allowed to continue in existence for so long as the reconstructed building shall stand.

     (e)    <u>Construction Fund</u>.  The net proceeds of the insurance collected on account of a casualty and the funds collected by the Association from assessments against Owners on account of such casualty shall constitute a construction fund, which shall be disbursed in payment of the cost of reconstruction and repair in the manner set forth in this Paragraph to be disbursed by the Association in appropriate progress payments to such contractor(s), supplier(s), and personnel performing the work or supplying materials or services for the repair and reconstruction of the structure as are designated by the Board of Directors.

     (f)    <u>Repair and Reconstruction of the Parking Facility</u>.  Notwithstanding anything to the contrary stated herein, in the event of damage to or destruction of all or any part of the Parking Facility, the repair and reconstruction thereof shall be conducted in accordance with Article V of the Parking and Easement Agreement.

13.     ARCHITECTURAL CONTROLS.

     (a)    <u>During the Declarant Control Period</u>.  During the Declarant Control Period, there shall be no Architectural Control Committee and all encroachments onto the Common Elements or Limited Common Elements, exterior change, alteration or construction (including painting and landscaping), and any erection, placement or posting of any object, sign, clothesline, speaker, playground equipment, light, fountain, flag, personalized or customized exterior door mat, or thing on the exterior or roof of the Building, in any windows (except for the window treatments as provided herein), or on any Limited Common Elements or any Common Elements, must receive the prior written approval of Declarant. However, a mezuzah or comparable religious symbol not larger than three inches (3") in width and nine inches (9") in height may be posted on the doorframe of the Unit.  In addition, reasonable seasonal decorative lights may be displayed from within a Unit between Thanksgiving and January 15.  Granting or withholding such approval shall be within the sole discretion of Declarant.  All references in the Condominium Instruments to the Architectural Control Committee or ACC shall refer to Declarant during the period the Declarant Control Period.  Notwithstanding anything to the contrary stated herein, the initial improvements constructed on the Condominium and all architectural modifications thereto that are made by the Declarant shall not be subject to approval pursuant to this Paragraph.

     (b)    <u>After the Declarant Control Period</u>.  After the Declarant Control Period has expired, an Architectural Control Committee shall be appointed by the Board of Directors and except for Declarant, for so long as Declarant owns a Unit for sale, no Owner, Occupant, or any other Person may make any encroachment onto the Common Elements or Limited Common Elements, or make any exterior change, addition, alteration, or construction (including painting and landscaping), nor erect, place or post any object, sign, clothesline, speaker, playground equipment, light, fountain, flag, personalized or customized exterior door mat, or thing on the exterior or roof of the Building, in any windows (except for the window treatments as provided herein), on any Limited Common Elements, or on any other Common Elements, without first obtaining the written approval of the ACC pursuant to this Paragraph 13.  However, a mezuzah or comparable religious symbol not larger than three inches (3") in width and nine inches (9") in height may be posted on the doorframe of the Unit.  In addition, reasonable seasonal decorative lights may be displayed from within a Unit between Thanksgiving and January 15.  The standard for approval of such improvements shall include, but not be limited to, aesthetic consideration, materials to be used, harmony with the external design of the existing Building, Units and structures, the location in relation to

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), 4:38,22

Deed Book 41978 Pg 497

surrounding structures and topography, and the impact of such approval, if any, on the increase or decrease of sounds and vibrations between the Units and between the Units and the Common Elements and the impact of such approval, if any, on the increase or decrease of sounds and vibrations between the Units and between the Units and the Common Elements. Notwithstanding the above, Declarant shall not be required to obtain any approvals under this Paragraph.

(c)   Alteration of Units.  Subject to the other provisions of this Declaration, alterations to the interiors of Units, relocation of the boundaries between adjoining Units, and subdivision of Units are subject to the following restrictions:

(i)   Alterations to the Interiors of the Units.   Notwithstanding anything to the contrary stated herein, no Owner or Occupant may make any of the following alterations to or within a Unit without first making a complete application to the ACC pursuant to subparagraph 13(d) below, and obtaining the prior written approval of the ACC: (A) an alteration that involves connecting to or relocating pipes, lines, conduits and/or other apparatus for access to common utilities; (B) an alteration that places an excessive load on any structural or load bearing portions of a Unit; (C) an alteration that requires penetration of any concrete floor or ceiling slab; (D) an alteration that requires penetration of any walls within a Unit; or (E) an alteration that involves the installation of thickset tile or other heavy  flooring materials on any portion of a Unit or a Limited Common Element of the Unit.   Approval for the interior modifications described in subparagraphs (B) through (E) above shall not be granted by the ACC unless the Owner or Occupant of the Unit has presented to the ACC the following information and/or documentation, and any other information as the ACC may reasonably require: (1) a report or drawing prepared and certified by a structural engineer licensed in the State of Georgia, which report or drawing shall demonstrate that such proposed interior modifications will not in any way affect or impair the structural soundness or integrity of the Building or any of the Units; (2) building plans for the proposed interior modifications; (3) all necessary permits or approvals required by governmental authorities for the proposed interior modifications; and (4) a certificate of insurance from applicant's contractor, which names the Master Association, the Association and the Owner of the Unit as an additional insured. In addition, within seven (7) days of completion of interior modifications described in subparagraphs (B) through (E) above, the ACC shall be provided with a copy of the certificate of occupancy, and an inspection report prepared and certified by a structural engineer licensed in the State of Georgia.

Furthermore, if alterations to the interior of a Unit requires the penetration of the concrete floor or ceiling slab, the Owner shall also provide the ACC with a report prepared and certified by a structural engineer licensed in the State of Georgia confirming that an x-ray analysis has been performed for the purposes of verifying that such penetration of the concrete floor or ceiling slab will not impair the structural integrity of such concrete floor or ceiling slab or result in the severing of any structural post-tension system or conduits that my be located within the concrete floor or ceiling slab.

Notwithstanding the foregoing, an Owner shall not relocate or make any connection to a Common Element pipe, line, conduit and/or other apparatus for access to common utilities if such connection will impair or have an adverse effect to the utilities or service of utilities to any other Unit.

(ii)   Relocation of Boundaries.  Boundaries between adjoining Units may be relocated only in accordance with the provisions of O.C.G.A. § 44-3-91 and this Declaration.  As long as Declarant owns a Unit for sale, an Owner must obtain the prior written consent of the Declarant and the Board of Directors in order to relocate the boundaries of his or her Unit.  After Declarant no

- 19 -

Nm:EMERSON2(946963),    :38,23

Deed Book 41978 Pg   498

longer owns a Unit for sale, an Owner must obtain the prior written consent only of the Board of Directors in order to relocate the boundaries of his or her Unit.  The Declarant shall have the right to relocate boundaries between Units owned by the Declarant without the approval of the Board of Directors, and the Board of Directors shall execute the required amendment to the Declaration.

      (iii)    <u>Subdivision of Units</u>.  An Owner may subdivide his Unit only in accordance with the provisions of O.C.G.A. § 44-3-92 and this Declaration.  As long as Declarant owns a Unit for sale, an Owner must obtain the prior written consent of Declarant and the Board of Directors in order to subdivide the boundaries of his or her Unit.  After Declarant no longer owns a Unit for sale, an Owner must obtain the prior written consent only of the Board of Directors in order to subdivide the boundaries of his or her Unit.  Declarant shall have the right to subdivide Units owned by Declarant without the approval of the Board of Directors, and the Board of Directors shall execute the required amendment to the Declaration.

      (d)    <u>Applications</u>.  Applications for approval of any such architectural modification shall be in writing and shall provide such information as the ACC may reasonably require, including, but not limited to, the documentation described in subparagraph 13(c) above.  Once an application and all required information is received by the ACC, the ACC shall stamp the application as being complete, and shall then forward to the applicant a written notice of application completion (the "Notice of Application Completion").  The ACC shall be authorized to retain an engineer, architect or other consultant to review such application and related documentation and plans, and all costs and expenses related thereto shall be borne solely by the applicant.  Approval of an application may be withheld by the ACC until such time as all costs and expenses related to the review of an application have been paid by the applicant.  The ACC shall be the sole arbiter of such application and may withhold approval for any reason, including purely aesthetic considerations, materials to be used, harmony with the external design of the Building and other structures that may be located on the Condominium, and it shall be entitled to stop any construction that is not in conformance with approved plans.  The Board or ACC may publish written architectural standards for exterior and Common Element alterations or additions, and any request in substantial compliance therewith shall be approved; provided, however, each such requested change shall be in harmony with the external design of the Building and Units, and the location in relation to surrounding structures and topography of the vicinity.

If the ACC or its designated representative fails to approve or to disapprove a complete application within thirty (30) days after the date of the Notice of Application Completion, its approval will not be required and this Paragraph will be deemed complied with; provided, however, even if the requirements of this Paragraph are satisfied, nothing herein shall authorize anyone to relocate Unit boundaries, subdivide a Unit, construct or maintain any structure or improvement (other than that which was requested and to which the ACC did not respond) that is in violation of this Declaration, the Bylaws or rules and regulations promulgated and adopted by the Association or of any applicable zoning or other laws.  Under no circumstances will alterations be made or permitted to be made by any Owner if such alteration will:

      (i)    unreasonably diminish the benefits afforded to such other Owners by any easement or license or unreasonably interrupt such other Owner's use or enjoyment of any easement or license; provided, however, interruption of the use and enjoyment of any easement or license for temporary construction purposes shall not require consent of the Owners if, upon completion of construction, each Owner's use and enjoyment of the affected easement or license is restored;

      (ii)    materially adversely affect or impair the structural integrity, character, value or utility of the Building (or any portion thereof);

      (iii)    materially adversely affect facilities benefiting any other Owners;

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963),   q:38,24

Deed Book 41978 Pg 499

(iv)     except as to signage, alter the facade or exterior appearance of any portion of the Building in any material respect; or

(v)      materially and adversely affects the rights of any Owner, Occupant or Person to exercise the easement rights granted in Paragraph 21 hereof.

(e)     Appeal.  In the event that the ACC or its designated representative disapproves any application or part thereof, an Owner shall have the right to appeal the ACC's decision to the Board of Directors.  The Board shall rule on the appeal within forty-five (45) days of receiving written notice requesting an appeal from the Owner.  In ruling on the appeal, the Board shall consider all relevant materials presented to it by either the Owner or the ACC, the decision of the ACC, and the application of the Owner to the ACC.  The Board of Directors shall have the final authority to approve, disapprove, or conditionally approve or disapprove the application of the Owner.  If the Board does not receive written notice from the Owner by certified mail requesting an appeal within fourteen (14) days from the date of the ACC's notice to the Owner of its decision, the decision of the ACC shall become final and all rights of appeal shall terminate and thereafter be void.

(f)     Encroachments onto Common Elements.  The ACC, subject to this Paragraph, may permit Owners to make encroachments onto the Common Elements as it deems acceptable.

(g)     Condition of Approval.  As a condition of approval for a requested architectural change, modification, addition, or alteration, an Owner, on behalf of himself or herself and his or her successors-in-interest, shall assume all responsibilities for maintenance, repair, replacement and insurance of such change, modification, addition, or alteration, unless such responsibilities are assumed by the Association in a written agreement.  It is the responsibility of every Owner of a Unit to determine for him or herself what architectural modifications have been made to his or her Unit by any predecessor-in-interest.  In the discretion of the Board or ACC, an Owner may be made to verify such condition of approval by written instrument in recordable form acknowledged by such Owner on behalf of himself or herself and all successors-in-interest.

(h)     Limitation of Liability.  Review and approval of any application pursuant to this Paragraph is made on the basis of aesthetic considerations only, and neither the Declarant, the Board of Directors nor the ACC shall bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, or for ensuring compliance with building codes and other governmental requirements.  Neither the Declarant, the Association, the Board of Directors, the ACC, nor member of any of the foregoing shall be held liable for any injury, damages or loss arising out of the manner or quality of approved construction on or modifications to any Unit.

(i)     No Waiver of Future Approvals.  Each Owner acknowledges that the members of the Board of Directors and ACC will change from time to time and that interpretation, application and enforcement of the architectural standards may vary accordingly. Each Owner further acknowledges that the Board of Directors and ACC may adopt different architectural standards for different parts of the Condominium, based on street visibility and location of the proposed modification in the Building. The approval of either the Board of Directors or the ACC of any proposals, plans and specifications or drawings for any work done or proposed, or in connection with any other matter requiring the approval and consent of the Board of Directors, or the ACC shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any similar proposals, plans and specifications, drawings, or matters whatever subsequently or additionally submitted for approval or consent.

- 21 -

Nm:EMERSON2(946963), q:38,25

Deed Book 41978 Pg 500

(j)     Enforcement.   Any construction, alteration, or other work done in violation of this Paragraph shall be deemed to be nonconforming.  Upon written request from the Board or the ACC, Owners shall, at their own cost and expense, promptly remove or cause the removal of such construction, alteration, or other work and shall restore the property to substantially the same condition as existed prior to the construction, alteration, or other work.  Should an Owner fail to remove and restore as required hereunder, the Board or its designees shall have the right to enter the property, remove the violation and restore the property to substantially the same condition as existed prior to the construction, alteration or other work.  All costs thereof, including reasonable attorneys' fees, may be assessed against the benefited Unit and collected as an assessment pursuant to this Declaration.

In addition to the foregoing, the Board of Directors shall have the authority and standing, on behalf of the Association, to impose reasonable fines and to pursue all legal and equitable remedies available to enforce the provisions of this Paragraph and its decisions.  Furthermore, the Board shall have the authority to record in the Fulton County land records notices of violation of the provisions of this Paragraph.

If any Owner or Occupant makes any change, alteration, or construction (including landscaping) upon the Common Elements or Limited Common Elements in violation of this Paragraph, he or she does so at his or her sole risk and expense.  The Board may require that the change, alteration or construction be removed or that it remain on the Common Elements or Limited Common Elements without reimbursement to the Owner or Occupant for any expense he or she may have incurred in making the change, alteration or construction.

(k)     Commencement of Construction. All changes, modifications and improvements approved by the ACC hereunder must be commenced within six (6) months from the date of approval.  If not commenced within six (6) months from the date of such approval, then such approval shall be deemed revoked by the ACC, unless the ACC gives a written extension for commencing the work.  All work approved by the ACC hereunder shall be completed in its entirety within ninety (90) days from the date of commencement, unless otherwise agreed in writing by the ACC.  All approved changes, modifications, and improvements must be completed in their entirety.  An Owner may not construct only a portion or part of an approved change, modification, or improvement.

14.     USE RESTRICTIONS.

Each Owner of a Unit shall be responsible for ensuring that the Owner's family, guests, tenants and Occupants comply with all provisions of the Condominium Instruments and the rules and regulations promulgated and adopted by the Association.  Furthermore, each Owner and Occupant shall always endeavor to observe and promote the cooperative purposes for which the Association was established.  In addition to any rights the Association may have against the Owner's family, guests, tenants or Occupants, as a result of such person's violation of the Condominium Instruments, the Association may take action under this Declaration against the Owner as if the Owner committed the violation in conjunction with the Owner's family, guests, tenants or Occupants.

In addition to the following use restrictions, the Board of Directors may adopt rules and regulations in accordance with the terms hereof as specified in the Bylaws.

(a)     Use of Units.   Each Unit shall be used for residential purposes only, and no trade or business of any kind may be conducted in or from a Unit or any part of the Condominium, except that the Owner or Occupant residing in a Unit may conduct ancillary business activities within the Unit so long as:

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963),   3:38,26

Deed Book 41978 Pg   501

(i)       the existence or operation of the business activity is not apparent or detectable by sight, sound, or smell from outside of the Unit;

(ii)      the business activity does not involve visitation of the Unit by employees, clients, customers, suppliers or other business invitees in greater volume than would normally be expected for guest visitation to a Unit without business activity;

(iii)     the business activity is legal and conforms to all zoning requirements for the Condominium;

(iv)      the business activity does not unreasonably increase traffic in the Condominium in excess of what would normally be expected for Units in the Condominium without business activity (other than by a reasonable number of deliveries by couriers, express mail carriers, parcel delivery services and other such similar delivery services);

(v)       the business activity does not increase the insurance premium paid by the Association or otherwise negatively affect the Association's ability to obtain insurance coverage;

(vi)      the business activity is consistent with the residential character of the Condominium and does not constitute a nuisance or a hazardous or offensive use, or threaten the security or safety of other residents of the Condominium, as determined in the Board's discretion; and

(vii)     the business activity does not result in a materially greater use of Common Elements or Association services.

The terms "business" and "trade," as used in this provision, shall be construed to have their ordinary, generally accepted meanings, and shall include, without limitation, any occupation, work, or activity undertaken on an ongoing basis that which involves the provision of goods or services to persons other than the provider's family and for which the provider receives a fee, compensation, or other form of consideration, regardless of whether: (i) such activity is engaged in full or part-time; (ii) such activity is intended to or does generate a profit; or (iii) a license is required therefor.  Notwithstanding the above, the use of a Unit by an on-site management agent operating on behalf of the Association shall not be considered a trade or business within the meaning of this Paragraph.

(b)      Number of Occupants.  The maximum number of Occupants in a Unit shall be limited to two (2) people per bedroom in the Unit, (as such bedrooms are depicted on the Survey and Floor Plans filed in the Official Records). For the purposes of this subparagraph (b), efficiency and studio-type Units shall constitute a one (1) bedroom  Unit. This occupancy restriction shall not apply to require the removal of any person lawfully occupying a Unit on the date of the recording of this Declaration. Upon written application, the Board shall grant variances to this restriction to comply with provisions of the Fair Housing Amendments Act of 1988 or any amendments thereto.

If an Owner of a Unit is a corporation, partnership, trust or other legal entity not being a natural person, the entity shall designate in writing to the Board the name(s) of the person(s) who will occupy the Unit.  The designated person(s) to occupy the Unit may not be changed more frequently than once every six (6) months without the prior written approval of the Board of Directors.

(c)      Outbuildings.  No structure of a temporary character, trailer, tent, shack, carport, garage, barn or other outbuilding shall be erected by any Owner or Occupant, other than Declarant, on any portion

- 23 -

Deed Book 41978 Pg 502

of the Condominium, at any time, either temporarily or permanently, without the prior written approval of the Board of Directors.

    (d)    Use of Common Elements Including Amenities.

        (i)    General.  There shall be no obstruction of the Common Elements, nor shall anything be kept on, parked on, stored on or removed from any part of the Common Elements without the prior written consent of the Board, except as specifically provided herein.  With prior written Board approval, and subject to any restrictions imposed by the Board, an Owner or Occupant may reserve portions of the Common Elements for use for a period of time as set by the Board.  Use of the Common Elements may also be subject to other rules and regulations of the Association.  Any such Owner or Occupant who reserves a portion of the Common Elements as provided herein shall assume, on behalf of himself or herself and his or her guests and family, all risks associated with the use of the Common Elements and all liability for any damage or injury to any person or thing as a result of such use.  The Association shall not be liable for any damage or injury resulting from such use unless such damage or injury is caused solely by the willful acts or gross negligence of the Association, its agents or employees. There shall be no use of or access to the roof of the Building by the Owners or Occupants or their respective family members, guests, tenants, invitees, agents or contractors; provided, however, the Association and its agents and contractors shall have access to the roof for performing its maintenance and repair responsibility. Furthermore, there shall be no gardening or landscaping on the Common Elements by Owners or Occupants without the prior written consent of the Board.

        Notwithstanding anything to the contrary stated herein, an Owner shall not be permitted to use the Common Elements, including the amenities, if such Owner's Unit is occupied by Occupants other than the Owner.  Furthermore, in accordance with subparagraph 10(c)(iv) hereof, the right of an Owner and/or Occupant to use the Common Elements may be suspended by the Association, acting through the Board, if assessments and other charges or any part thereof remain unpaid more than thirty (30) days after they become delinquent.

        This subparagraph shall not apply to the Declarant, for so long as the Declarant shall own a Unit for sale.

        (ii)    Planned Gathering.  Use of the Common Elements by an Owner or Occupant and more than six (6) guests shall constitute a "planned gathering," which shall be registered with the Board.  In order to conduct a "planned gathering" on a portion of the Common Elements, an Owner or Occupant shall first reserve the desired portion of the of the Common Elements in accordance with subparagraph (i) above.

    (e)    Use of Limited Common Elements, Storage Spaces and Balconies.  Except as otherwise provided herein, the use of the Limited Common Elements assigned to the Units is restricted exclusively to the Owners of the Unit to which such Limited Common Elements are assigned, and said Owner's family members, guests, tenants and invitees. The Limited Common Elements are reserved for exclusive use, but shall not be construed or interpreted to be separate and apart from the Common Elements in general, and the restrictions applicable to the Common Elements shall also apply to the Limited Common Elements.

        (i)    Storage Spaces.  Storage spaces shall be used solely for the purpose of storing any personal property belonging to the Owner or Occupant of the Unit to which such storage space is assigned as a Limited Common Element.  No Owner or Occupant shall store any explosives, or any flammable, odorous, noxious, corrosive, hazardous or pollutant materials or any other goods in a storage space that would cause danger or nuisance to the storage space, or the Condominium.  A

- 24 -

Nm:EMERSON2(946963)  q:38,28

Deed Book 41978 Pg 503

storage space shall not be used for any purposes unlawful or contrary to any ordinance, regulation, fire code, or health code. A storage space shall not be used to house pets for any period of time. If hazardous substances are stored, used, generated or disposed of on or in a storage space or if a storage space becomes contaminated in any manner for which the Owner or Occupant thereof is legally liable, Owner or Occupant shall indemnify and hold harmless Declarant, Association, the Board of Directors, and their respective agents from any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses and any and all sums paid from settlement of claims, attorneys' fees, consultant and expert fees, arising as a result of that contamination by Owner or Occupant.

(ii)   Balconies.  No objects, including by way of illustration, but not limitation, potted plants, grills, umbrellas, bicycles, laundry garments, towels, awnings, canopies and all other objects, may be located on a balcony serving a Unit.  No object shall be permitted to hang over or be attached to any exterior surface of a balcony wall or to otherwise protrude outside of the vertical plane formed by the exterior surface of a balcony wall.  Penetration of the surfaces of a balcony floor or a balcony wall is also prohibited.  Enclosure of a balcony is also prohibited.  As used herein, "enclosure" shall mean the permanent enclosure of a balcony into the heated and cooled space within the boundaries of a Unit or any portion thereof.  Notwithstanding the foregoing, only patio tables and chairs constructed of contemporary-styled natural teak (as defined by the Architectural Controls Committee in its reasonable discretion), cast aluminum or wrought iron may be placed on a balcony.  Patio tables and chairs constructed of other materials and patio furniture padding covered in synthetic materials are prohibited.

Notwithstanding anything to the contrary stated herein, the foregoing restrictions shall not be applicable to any balcony attached to and serving a Unit having a "P1" unit type, as shown on Exhibit "B", and objects (other than those permitted in this subparagraph) may be placed on such balconies with the consent of the Architectural Controls Committee, which consent shall not be unreasonably withheld, conditioned or delayed.

Furthermore, notwithstanding anything to the contrary stated herein, it shall be the sole responsibility of the Owner or Occupant of all Units to remove all permitted objects from a balcony during periods of high winds to prevent permitted objects from being blown from a balcony and to refrain from engaging in any activity on a balcony that may cause object to fall from a balcony.

(f)   Prohibition of Damage, Nuisance and Noise.  Without the prior written consent of the Board of Directors, nothing shall be done or kept on the Condominium, or any part thereof, which would increase the rate of insurance on the Condominium or any Unit or part thereof, which would be in violation of any statute, rule, ordinance, regulation, permit or other validly imposed requirements of any governmental body, or which would increase the Common Expenses.

The dwelling Units in the Condominium are built in close proximity to one another, resulting in the sharing of common walls, floors and ceilings.  As a result, noise and vibration may be detectable between Units or between Units and the Common Elements.  Therefore, an Owner or Occupant shall not conduct activities within a Unit or use a Unit in a manner that unreasonably interferes with or causes disruption to the use and quiet enjoyment of another Unit by its respective Owner and Occupant.

Furthermore, noxious, destructive or offensive activity shall not be carried on within any portion of the Condominium.  No Owner or Occupant of a Unit may use or allow the use of the Unit or any portion of the Condominium at any time, in any way or for any purpose that may endanger the health, unreasonably annoy or disturb or cause embarrassment, or discomfort to other Owners or Occupants, or in such a way as to constitute, in the sole opinion of the Board of Directors, a nuisance.  In addition, no Owner or Occupant of a Unit may use or allow the use of a Unit or the Common Elements in any manner which creates

- 25 -

Nm:EMERSON2(946963)   q:38.29

Deed Book 41978 Pg 504

disturbing noises, including, without limitation, use of stereo speakers or equipment that will in the sole discretion of the Board of Directors interfere with the rights, comfort or convenience of the other Owners or Occupants. Nothing herein, however, shall be construed to affect the rights of an aggrieved Owner to proceed individually for relief from interference with his or her property or personal rights.

No Owner, Occupant or agent of such Owner or Occupant shall do any work that, in the reasonable opinion of the Association's Board of Directors or its designee, would jeopardize the soundness or safety of the Condominium or any structure created thereon, would reduce the value thereof, or would impair any easement or other interest in real property thereto, without in every such case the unanimous, prior written consent of all members of the Association and their Mortgagees.

No damage to or waste of the Common Elements, or any part thereof, shall be permitted by any Owner or member of his or her family or any invitee of any Owner. Each Owner shall indemnify and hold the Association and the other Owners harmless against all loss to the Association or other Owners resulting from any such damage or waste caused by such Owner, members of his or her family, guests, invitees, or Occupants of his or her Unit.

(g)   Firearms and Fireworks.  The display or discharge of firearms or fireworks on the Common Elements or Limited Common Elements is prohibited; provided, however, the display of lawful firearms on the Common Elements or Limited Common Elements is permitted by law enforcement officers and also is permitted for the limited purpose of transporting the firearms across the Common Elements or Limited Common Elements to or from the Owner's Unit. The term "firearms" includes "B-B" guns, pellet guns, and other firearms of all types, regardless of size, and shall also include, without limitation, slingshots, archery, and other projectile emitting devices. The term "fireworks" shall include those items as listed in O.C.G.A. § 25-10-1, as amended.

(h)   Animals.  No Owner or Occupant may keep any animals on any portion of the Condominium except as expressly permitted in this subparagraph. An Owner or Occupant shall keep no more than two (2) dogs and/or cats (for a combined total of two (2)) per Unit. In addition, an Owner or Occupant may keep a reasonable number of other generally recognized household pets, as determined in the Board's sole discretion, weighing less than two (2) pounds each (including by way of illustration, but not limitation, fish, gerbils and small birds).

No Owner or Occupant may keep, breed or maintain any pet for any commercial purpose, and no structure for the care, housing, or confinement of any pet shall be constructed or maintained on any part of the Common Elements, including Limited Common Elements, without prior written ACC approval. No pets are allowed on any portion of the Common Elements; provided, however, an Owner or Occupant may walk a pet in designated areas on the Common Elements or across the Common Elements for the purposes of entering or exiting the Building, using the most direct route. Notwithstanding the foregoing, pets must be kept on a leash and be under the physical control of a responsible person at all times while on the Common Elements. Feces left upon the Common Elements by pets must be immediately removed by the owner of the pet or the person responsible for the pet.

No potbellied pigs, snakes, American Pit Bull Terriers, rotweillers, Doberman pinschers, or other animals determined in the Board's sole discretion to be dangerous or potentially dangerous shall not be brought onto or kept on the Condominium at any time. The Board may require that any animal that, in the Board's opinion, endangers or potentially may endanger the health of any Owner or Occupant or creates or potentially may create a nuisance or unreasonable disturbance, be permanently removed from the Condominium upon seven (7) days written notice. If the Owner or Occupant fails to do so, the Board may remove the pet. Any pet that in the Board's sole discretion presents an immediate danger to the health,

- 26 -

Nm:EMERSON2(946963)   q:38,30

Deed Book 41978 Pg 505

life-safety or property of any community member may be removed by the Board without prior notice to the pet's owner.

Any Owner or Occupant who keeps or maintains any pet upon the Condominium shall be deemed to have agreed to indemnify and hold the Association, its directors, officers, and agents free and harmless from any loss, claim or liability of any kind or character whatever arising by reason of keeping or maintaining such pet within the Condominium.

(i)     Parking.     Each Unit shall have at least one (1) parking space assigned as a Limited Common Element, exclusively serving a particular Unit.  Such assigned parking spaces are designated Limited Common Elements and may only be used by the Owner or Occupants to whom the parking spaces are assigned, and their guests and families.

Notwithstanding anything to the contrary stated herein, with respect to the handicap parking spaces that may be assigned as Limited Common Elements and shown on the Floor Plans as "HC," such handicap parking spaces shall be assigned subject to the rights of the Declarant (for so long as Declarant owns a Unit primarily for the purposes of sale or lease) or the Association (at such time when the Declarant no longer owns a Unit primarily for the purposes of sale or lease) requiring the Owner to whose Unit such handicap parking space has been assigned as a Limited Common Element (hereinafter, the "Original Owner") to grant a license to use such handicap parking space to another Owner (hereinafter, the "Disabled Owner"), provided that (i) the Disabled Owner (or his or her Occupant) qualifies under applicable laws to use a handicap parking space in public facilities, (ii) the Disabled Owner provides the Original Owner with a license to use the Disabled Owner's parking space located in the Condominium, and (iii) upon such time that the Disabled Owner (or his or her Occupant) no longer qualifies as provided in subsection (i) hereof, the licenses shall automatically expire and the Original Owner and the Disabled Owner shall use their respective, original parking spaces.

For so long as Declarant owns a Unit primarily for the purpose of sale, Declarant may sell one or more parking spaces (which parking spaces shall thereafter be Limited Common Elements appurtenant to the Unit to which they have been sold) to an Owner and may adopt rules regulating the use of unassigned parking spaces.

Vehicles permitted under this subparagraph may be parked only in designated, lined parking spaces, or other areas authorized in writing by the Board.

Disabled and stored vehicles are prohibited from being parked on the Condominium.  For purposes hereof, a vehicle shall be considered "disabled" if it does not have a current license tag or is obviously inoperable.  A vehicle shall be considered "stored" if it remains on the Condominium without being driven for fourteen (14) consecutive days or longer without prior written Board permission.

Boats, trailers, jet-skis and trailers for same, panel trucks, buses, trucks with a load capacity of one (1) ton or more, vans (excluding vans used by handicapped persons, mini-vans or utility vehicles used as passenger vehicles and receiving a "car" or "passenger vehicle" classification by the Georgia Department of Motor Vehicles), recreational vehicles (RV's and motor homes), vehicles used primarily for commercial purposes, and vehicles with commercial writings on their exteriors other than Sheriff's, Marshall's, or police officer's vehicles marked as such, are also prohibited from being parked on the Condominium, except in areas that may be designated by the Board as parking areas for particular types of vehicles.  Notwithstanding the above, trucks, vans, commercial vehicles and vehicles with commercial writings on their exteriors shall be allowed temporarily on the Common Elements during normal business hours for the purpose of serving any Unit or the Common Elements; provided, however, no such vehicle shall remain on the Common Elements overnight or for any purpose unless prior written consent of the Board is first obtained.

- 27 -

Nm:EMERSON2(946963)　q:38,31

Deed Book 41978 Pg   506

If any vehicle is parked on any portion of the Condominium in violation of this Paragraph or in violation of the Association's rules and regulations, the Board or agent of the Association may place a notice on the vehicle specifying the nature of the violation and stating that after twenty-four (24) hours the vehicle may be towed or booted. The notice shall include the name and telephone number of the person or entity that will do the towing or booting and the name and telephone number of a person to contact regarding the alleged violation. If twenty-four (24) hours after such notice is placed on the vehicle the violation continues or thereafter occurs again within six (6) months of such notice, the Board or agent of the Association may have the vehicle towed or booted in accordance with the notice, without further notice to the Owner or user of the vehicle.

If a vehicle is parked in a fire lane, is blocking another vehicle or access to another Owner's Unit or parking space, is obstructing the flow of traffic, is parked on any grassy area, is parked in a parking space that has been assigned as exclusively serving another Unit, or otherwise creates a hazardous condition, no notice shall be required and the Board or agent of the Association may have the vehicle towed immediately. If a vehicle is towed in accordance with this subparagraph, neither the Association nor any officer or agent of the Association shall be liable to any person for any claim of damage as a result of the towing activity. Notwithstanding anything to the contrary herein, the Board may elect to impose fines or use other available sanctions, rather than exercise its authority to tow or boot.

(j)     Heating of Units in Colder Months. In order to prevent damage within a Unit, including, but not limited to, cracks in finish materials, and breakage of water pipes during colder months of the year resulting in damage to any portion of the Condominium, increased Common Expenses, and increased insurance premiums or cancellation of insurance policies due to numerous damage claims, the thermostats within the Units shall be maintained with the heat in an "on" position and at a minimum temperature setting of fifty-five degrees (55°) Fahrenheit (except during power failures or periods when heating equipment is broken) whenever the temperature is forecasted to or does reach thirty-two degrees (32°) Fahrenheit or below. Owners and Occupants of Units shall take all steps possible on a timely basis to keep heating equipment, including, but not limited to, the thermostat, in good working order and repair. The Board of Directors may fine any Owner or Occupant and/or may cause the water service to the violator's Unit to be discontinued for violation of this subparagraph, in addition to any other remedies of the Association.

(k)     Signs. Except as may be provided for herein or as may be required by legal proceedings, and except for signs which may be erected by Declarant related to the development and sale of Units, no signs (including, but not limited to, "For Sale" or "For Rent" signs), advertising posters, political placards or billboards of any kind shall be erected, placed, or permitted to remain on the Condominium without the prior written consent of the Board or its designee. The Board shall have the right to erect reasonable and appropriate signs on behalf of the Association.

(l)     Rubbish, Trash, and Garbage. All rubbish, trash and garbage shall be regularly removed from a Unit and shall not be allowed to accumulate therein. No rubbish, trash or garbage shall be placed on the Common Elements (except for those portions of the Common Elements designated as recycling areas) or Limited Common Elements outside of the Unit, temporarily or otherwise, and shall be moved to the Condominium trash facilities for collection, or otherwise removed from the Condominium by an Owner or Occupant. Notwithstanding anything to the contrary stated hereon, only ordinary household trash shall be disposed of in sealed trash bags (not greater than 13-gallon trash bags) and placed in the trash chute. Items that cannot be easily disposed of through the trash chute, including, without limitation, cardboard boxes and other large or bulky items that do not fit within a 13-gallon trash bag shall be moved to the Condominium trash facilities for collection, or otherwise removed from the Condominium by an Owner or Occupant. All Owners and Occupants shall refrain from using the trash chute between the hours of 10:00 p.m. and 8:00 a.m. In addition, all Owners and Occupants acknowledge that use of the trash chute may create noise and

- 28 -

Deed Book 41978 Pg 507

vibration, and that such noise and vibration shall not constitute an interference or disruption to the use and quiet enjoyment of a Unit.

(m)     Unsightly or Unkempt Conditions.  The pursuit of hobbies or other activities, including, but not limited to the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly, or unkempt conditions, shall not be pursued or undertaken on any part of the Condominium.  Clothing, bedding, rugs, mops, appliances, indoor furniture, and other household items shall not be placed or stored outside the Unit.

(n)     Garage Sales.  Garage sales, yard sales, flea markets, or similar activities are prohibited unless approved in writing by the Board of Directors.

(o)     Window Treatments.  All windows in a Unit must have window treatments.  The color of all window treatments visible from outside the Unit must be white or off-white.  Bed sheets shall not be used as window treatments.

(p)     Antennas and Satellite Dishes.  Except as provided below, no satellite dish, antenna or other device for the transmission or reception of television signals, radio signals or any form of electromagnetic wave or radiation shall be erected, used or maintained on any portion of the Condominium, including the Unit or Limited Common Elements; provided, however, the Association shall have the right to erect, construct and maintain such devices.  The following shall apply to all Owners:

(i)     No transmission antenna, of any kind, may be erected anywhere on the Condominium, including the Units, without written approval of the Board of Directors or the Architectural Control Committee.

(ii)     No direct broadcast satellite (DBS) antenna or multi-channel multi-point distribution service (MMDS) antenna larger than one meter in diameter shall be placed, allowed or maintained upon the Condominium, including the Units and the Limited Common Elements.

(iii)     Subject to the last sentence of this subparagraph 14(p), DBS and MMDS satellite dishes or antennas one meter or less in diameter and television broadcast service antennas may only be installed in accordance with Federal Communication Commission (FCC) rules and the rules and regulations of the Association, and only if and to the extent such rules mandate that such dishes or antennas be allowed, both as may be amended from time to time.  In such event, to the extent permissible under the FCC rules and regulations, (A) such satellite dishes and antennas shall not be located above a line 3-feet (3') from the floor of the balconies or outside of the balcony railings, (B) such satellite dishes and antennas shall be in a uniform color designated by the Board of Directors or Architectural Control Committee, and (C) the Board of Directors or Architectural Control Committee may designate and restrict the specific location and color of such satellite dishes and antennas.  To the extent that any of the foregoing subsections (A) through (C) is not permitted under the FCC rules and regulations, the remaining portion of this subparagraph (p) shall survive independently to the extent permissible under the FCC rules and regulations.

In the event of a transfer of the Unit that includes a satellite dish or antenna, the Grantee shall assume all responsibility for the satellite dish or antenna and shall comply with this Declaration, the Bylaws and the rules and regulations regarding satellite dishes and antennas, including, but not limited to, those requirements relating to maintenance and removal of satellite dish or antenna.

- 29 -

Nm:EMERSON2(946963)    q:38,33

Deed Book 41978 Pg 508

To the extent allowed by FCC rules and regulations, the Association shall maintain at its expense a master DBS dish or antenna system that Owners and Occupants shall be required to utilize in lieu of individual DBS dishes and antennae.

(q)     Grilling.  The use of outdoor grills on any portion of the Condominium, including without limitation the Limited Common Element balconies, is prohibited; provided, however, Owners and Occupants are permitted to use grills located on the Common Elements that are provided by Declarant or the Association, if any.

(r)     Abandoned Personal Property.  Personal property, other than vehicles as provided for in subparagraph (i) shall not be kept, or allowed to remain for more than twenty-four (24) hours upon any portion of the Common Elements, other than on a Limited Common Element, without prior written Board permission.  If the Board determines that a violation exists, then, not less than two (2) days after written notice is placed on the personal property and/or on the front door of the property owner's Unit, if known, the Board may remove and either discard or store the personal property in a location which the Board may determine and shall have no obligation to return, replace or reimburse the owner of the property.  The notice shall include the name and telephone number of the person or entity, which will remove the property and the name and telephone number of a person to contact regarding the alleged violation.

The Board, in its discretion, may determine that an emergency situation exists and may exercise its removal rights hereunder without prior notice to the property owner; provided, however, in such case, the Board shall give the property owner, if known, notice of the removal of the property and the location of the property within three (3) days after the property is removed.

Neither the Association nor any officer or agent thereof shall be liable to any person for any claim of damage resulting from the removal activity in accordance herewith.  The Board may elect to impose fines or use other available remedies, rather than exercise its authority to remove property hereunder.

(s)     Replacing Carpet with Tile or Hardwood Floors.  Other than Declarant, no Owner, Occupant, or any other person may replace carpeting with a tile, marble, vinyl, hardwood floor, or other hard surfaced flooring material, on the interior floor of a Unit which is located immediately above another Unit without first obtaining written approval of Declarant or the Architectural Control Committee, as applicable, as set forth in Paragraph 13.  Among other factors, Declarant or the Architectural Control Committee, as applicable, may consider whether the change will cause noise to any Unit below which will exceed the average noise level in Units below Units with carpeted floors and that the weight of such proposed flooring is appropriate and will not cause problems to the structure or subflooring.

The Owner applying for such approval shall provide the Declarant or the Architectural Control Committee, as applicable, with information regarding these factors, as well as other information requested by the Declarant or the Architectural Control Committee regarding the proposed flooring and its effect; provided, however, the noise level requirements shall be considered to be met if the Owner provides a sound transmission test that the proposed flooring will create a noise level less than a standard level set by reasonable regulation of the Declarant or the Architectural Control Committee, as applicable. Notwithstanding anything to the contrary stated herein, at least seventy-five percent (75%) of each room within a Unit located above another Unit (excluding the kitchen and bathrooms) shall have area rugs or carpet unless the flooring is sound-proofed so as not to exceed the noise level in Units with carpeted floors.

(t)     Sale Period.  Notwithstanding any provision contained in this Declaration to the contrary, during the period of the sale of the Units it shall be expressly permissible for Declarant, its contractors, agents, employees, assigns and representatives, to maintain and carry on, upon such portion of the Condominium as Declarant may deem necessary, such facilities and activities as in the sole opinion of

- 30 -

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), q:38,34

Deed Book 41978 Pg 509

Declarant may be reasonably required, convenient or incidental to the completion and sale of the Units, including, but without limitation, business offices, signs, model Units and sales offices. The right to maintain and carry on such facilities and activities shall include specifically the right to use the parking facilities on the Condominium for such purposes and to use the Units owned by Declarant as model Units and as offices for the sale of the Units and related activities.

(u)     Move In/Move Out.  An Owner or Occupant shall not move furniture, personal property, construction materials, and other over-sized items in or out of the Condominium except during such hours and according to requirements set forth by the Board of Directors.  Furthermore, an Owner or Occupant shall reserve a date and time with the Board of Directors to use the service elevator for moving furniture, personal property, construction materials, and other over-sized items in or out of the Condominium, and during such use of the service elevator, the walls of the service elevator being used for such purpose shall be covered with padded blankets.  The Board of Directors, in its sole discretion, may require a non-refundable security deposit prior to using the service elevator for moving furniture, construction materials or other over-sized items.  The Board of Directors shall also be authorized to approve movers and/or moving companies that require access to the Condominium for the purpose of moving furniture, construction materials, and other over-sized items, on behalf of an Owner or Occupant, in or out of the Condominium, and such consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding anything to the contrary stated herein, an Owner or Occupant shall not leave unattended any furniture, personal property, construction materials, and other over-sized items on any portion of the Common Elements for any period of time.

(v)     Life-Safety Systems.  Owners and Occupants shall not tamper with or disengage any portion of the life-safety systems that serve the Condominium including, without limitation, the sprinkler heads and all branch and feed lines that support such sprinkler heads, and all fire control devices (such as smoke detectors and call boxes), regardless of whether such items are located within the boundaries of a Unit.

15.     LEASING.

In order to preserve the character of the Condominium as predominantly owner-occupied, and to comply with the eligibility requirements for financing in the secondary mortgage market, the leasing of Units shall be governed by the restrictions imposed by this Paragraph.  Except as provided herein, the leasing of Units shall be prohibited.  "Leasing," for the purposes of this Declaration, is defined as regular, exclusive occupancy of a Unit by any Person other than the Owner.  For purposes hereof, occupancy by a roommate of an Owner who occupies the Unit as such Owner's primary residence shall not constitute Leasing hereunder.

(a)     General.  Owners desiring to lease their Units may do so only if they have applied for and received from the Board of Directors either a "Leasing Permit" or a "Hardship Leasing Permit." Such a permit, upon its issuance, will allow an Owner to lease his or her Unit provided that such Leasing is in strict accordance with the terms of the permit and this Paragraph.  The Board of Directors shall have the authority to establish conditions as to the duration and use of such permits consistent with this Paragraph. All Leasing Permits and Hardship Leasing Permits shall be valid only as to a specific Owner and Unit and shall not be transferable between either Units or Owners, but shall be transferable to successors-in-title to the same Unit.

(b)     Leasing Permits.  An Owner's request for a Leasing Permit shall be approved if current, outstanding Leasing Permits have not been issued for more than twenty-five percent (25%) of the total number of Units (excluding Units owned by the Declarant) in the Condominium. A Leasing Permit shall be automatically revoked upon the happening of any of the following events: (i) the failure of an Owner

- 31 -

Nm:EMERSON2(946963)q:38,35

Deed Book 41978 Pg 510 

to lease his or her Unit within one hundred eighty (180) days of the Leasing Permit having been issued; (ii) the failure of an Owner to have his or her Unit leased for any consecutive one hundred eighty (180) day period thereafter; or (iii) the occurrence of the date referenced in a written notification by the Owner to the Association that the Owner will, as of said date, no longer need the Leasing Permit. If current Leasing Permits have been issued for more than twenty-five percent (25%) of the total number of Units, no additional Leasing Permits shall be issued until the number of outstanding current Leasing Permits falls below twenty-five percent (25%) of the total number of Units in the Condominium. Owners who have been denied a Leasing Permit shall automatically be placed on a waiting list for a Leasing Permit and shall be issued the same if they so desire when the number of current outstanding Leasing Permits issued falls to twenty-five percent (25%) or less of the total number of Units in the Condominium. The issuance of a Hardship Leasing Permit to an Owner shall not cause the Owner to be removed from the waiting list for a Leasing Permit.

(c)     Hardship Leasing Permits.  If the failure to lease will result in a hardship, the Owner may seek to lease on a hardship basis by applying to the Board of Directors for a Hardship Leasing Permit. The Board of Directors shall have the authority to issue or deny requests for Hardship Leasing Permits in its discretion after considering the following factors: (i) the nature, degree, and likely duration of the hardship, (ii) the harm, if any, which will result to the Condominium if the permit is approved, (iii) the number of Hardship Leasing Permits which have been issued to other Owners, (iv) the Owner's ability to cure the hardship, and (v) whether previous Hardship Leasing Permits have been issued to the Owner. A "hardship" as described herein shall include, but not be limited to the following situations: (A) an Owner must relocate his or her residence outside the greater Atlanta metropolitan area and cannot, within six (6) months from the date that the Unit was placed on the market, sell the Unit except at a price below the current appraised market value, after having made reasonable efforts to do so; (B) where the Owner dies and the Unit is being administered by his or her estate; and (C) the Owner takes a leave of absence or temporarily relocates and intends to return to reside in the Unit. Hardship Leasing Permits shall be valid for a term not to exceed one (1) year. Owners may apply for additional Hardship Leasing Permits. Hardship Leasing Permits shall be automatically revoked if during the term of the permit, the Owner is approved for and receives a Leasing Permit.

(d)     Leasing Provisions.  Leasing which is authorized, pursuant to permit, hereunder shall be governed by the following provisions:

(i)     Notice.  At least thirty (30) days prior to entering into the lease of a Unit, the Owner shall provide the Board with a copy of the proposed lease agreement.  The Board shall approve or disapprove the form of said lease.  In the event a lease is disapproved, the Board shall notify the Owner of the requisite action to be taken in order to bring the lease in compliance with the Declaration and any rules and regulations adopted pursuant thereto.

(ii)     General.  Units may be leased only in their entirety; no fraction or portion may be leased without prior written Board approval.  All leases shall be in writing and in a form approved by the Board prior to the effective date of the lease.  The Board may maintain and, upon request, provide a form that is deemed acceptable.  There shall be no subleasing of Units or assignment of leases without prior written Board approval.  All leases must be for an initial term of not less than one (1) year, except with written Board approval, which shall not be unreasonably withheld in cases of undue hardship.  Within ten (10) days after executing a lease agreement for the lease of a Unit, the Owner, at its own expense, shall provide the Board with a copy of the lease and the name of the lessee and all other people occupying the Unit.  The Owner shall provide, at its own expense, the lessee copies of the Declaration, Bylaws, and the rules and regulations.  Nothing herein shall be construed as giving the Association the right to approve or disapprove a proposed lessee; the Board's approval or disapproval shall be limited to the form of the proposed lease.

- 32 -

Nm:EMERSON2(946963)   q:38,36

Deed Book 41978 Pg  511

    (iii)    <u>Liability for Assessments, Use of Common Elements, and Compliance with Declaration, Bylaws, and Rules and Regulations</u>. Each Owner covenants and agrees that any lease of a Unit shall contain the following language and agrees that if such language is not expressly contained therein, then such language shall be incorporated into the lease by existence of this covenant, and the lessee, by occupancy of the Unit, agrees to the applicability of this covenant and incorporation of the following language into the lease:

    (A)    <u>Compliance with Declaration, Bylaws, and Rules and Regulations</u>. The lessee shall comply with all provisions of the Declaration, Bylaws, and rules and regulations adopted pursuant thereto and shall control the conduct of all other Occupants and guests of the leased Unit in order to ensure such compliance. The Owner shall cause all Occupants of his or her Unit to comply with the Declaration, Bylaws, and the rules and regulations adopted pursuant thereto, and shall be responsible for all violations by such Occupants, notwithstanding the fact that such Occupants of the Unit are fully liable and may be sanctioned for any such violation. If the lessee, or a person living with the lessee, violates the Declaration, Bylaws, or a rule or regulation for which a fine is imposed, notice of the violation shall be given to the Owner and the lessee, and such fine may be assessed against the lessee in accordance with Article V of the Bylaws. If the fine is not paid by the lessee within the time period set by the Board, the Owner shall pay the fine upon notice from the Association of the lessee's failure to pay the fine. Unpaid fines shall constitute a lien against the Unit.

    Any violation of the Declaration, Bylaws, or rules and regulations adopted pursuant thereto by the lessee, any Occupant, or any guest of lessee, is deemed to be a default under the terms of the lease and authorizes the Owner to terminate the lease without liability and to evict the lessee in accordance with Georgia law. The Owner hereby delegates and assigns to the Association, acting through the Board, the power and authority of enforcement against the lessee for breaches resulting from the violation of the Declaration, Bylaws, and the rules and regulations adopted pursuant thereto, including the power and authority to evict the lessee as attorney-in-fact on behalf and for the benefit of the Owner, in accordance with the terms hereof. If the Association proceeds to evict the lessee, any costs, including reasonable attorneys' fees actually incurred and court costs associated with the eviction shall be an assessment and lien against the Unit.

    (B)    <u>Use of Common Elements</u>. The Owner transfers and assigns to the lessee, for the term of the lease, any and all rights and privileges that the Owner has to use the Common Elements, including but not limited to, the use of any and all recreational facilities and other amenities.

    (C)    <u>Liability for Assessments</u>. When an Owner who is leasing his or her Unit fails to pay any annual or special assessment or any other charge for a period of more than thirty (30) days after it is due and payable, then the delinquent Owner hereby consents to the assignment of any rent received from the lessee during the period of delinquency, and, upon request by the Board, lessee shall pay to the Association all unpaid annual and special assessments and other charges payable during and prior to the term of the lease and any other period of occupancy by lessee. However, lessee need not make such payments to the Association in excess of, or prior to the due dates for, monthly rental payments unpaid at the time of the Board's request. All such payments made by lessee shall reduce, by the same amount, lessee's obligation to make monthly rental payments to lessor. If lessee fails to comply with the Board's request to pay assessments or other charges, lessee shall pay to the Association all amounts authorized under the Declaration as if lessee were an Owner.

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Deed Book 41978 Pg  512

The above provision shall not be construed to release the Owner from any obligation, including the obligation for assessments, for which he or she would otherwise be responsible.

(e)     Applicability of this Paragraph.  Notwithstanding the above, this Paragraph shall not apply to any leasing transaction entered into by Declarant (regardless of whether said lease is entered into prior to or after the expiration of the Declarant Control Period), the Association, (in the case of any first Mortgage on a Unit who becomes the Owner of a Unit through foreclosure or any other means pursuant to the satisfaction of the indebtedness secured by such Mortgage.  Such parties shall be permitted to lease a Unit without first obtaining a permit in accordance with this Paragraph, and such Units shall not considered as being leased in determining the maximum number of Units that may be leased in accordance with this Paragraph.

16.     TRANSFER OR SALE OF UNITS.

An Owner intending to make a transfer or sale of a Unit or any interest in a Unit shall give written notice to the Board of Directors of such intention within seven (7) days after execution of the purchase agreement (in the case of the purchase of a Unit) or transfer documents (in the case of the conveyance of a Unit without a purchase of said Unit).  The Owner shall furnish to the Board as part of the notice (i) the name and address of the intended grantee; and (ii) such other information as the Board may reasonably require.  In addition, the purchase agreement or transfer documents shall attach a copy of the Declaration, Bylaws, all amendments to said Declaration and Bylaws, and rules and regulations of the Association.  This Paragraph shall not be construed to create a right of first refusal in the Association or in any third party.

In addition, a non-refundable contribution to the working capital fund of the Association shall be paid to the Association by the purchaser of a Unit at the closing of each sale or resale of a Unit in the amount of two (2) months of the general assessment charges to such Unit in accordance with Paragraph 10(i) hereof.

Within seven (7) days after receiving title to a Unit, the new Owner shall give written notice to the Board of Directors of his or her ownership of the Unit.  Upon failure of the new Owner to give the required notice within the seven (7) day time period provided herein, the Board may levy fines against the Unit and the Owner thereof, and assess the Owner for all costs incurred by the Association in determining his or her identity.

17.     MAINTENANCE RESPONSIBILITY.

(a)     By the Owner.  Each Owner shall have the obligation to maintain and keep in good repair all portions of his or her Unit and all Limited Common Elements assigned to the Unit except any portion of a Unit and/or Limited Common Element that is expressly made the maintenance obligation of the Association as set forth in subparagraph (b) below.  This maintenance responsibility shall include, but not be limited to the following: all glass surfaces (excluding exterior cleaning), windows, window frames (except for periodic painting and/or staining of the exterior window frames), casings and locks (including the interior caulking of windows); all doors, doorways, door frames, and hardware that are part of the entry system of the Unit (except for periodic painting and/or staining of the exterior surface of entry doors and door frames of the Condominium); all portions of the heating and air conditioning system, including the air conditioning compressor and the fan coil serving the Unit; and all pipes, lines, ducts, conduits, or other apparatus which serve only the Unit, whether located within or without a Unit's boundaries (including all electricity, water, sewer, or air conditioning pipes, lines, ducts, conduits, or other apparatus serving only the Unit).

- 34 -

Deed Book 41978 Pg  513

In addition, each Owner shall have the responsibility:

(i)     to keep in a neat, clean and sanitary condition any Limited Common Elements serving his or her Unit;

(ii)    to perform his or her responsibilities in such manner so as not to unreasonably disturb other persons in other Units;

(iii)   to promptly report to the Association or its agent any defect or need for repairs, for which the Association is responsible; and

(iv)    to pay for the cost of repairing, replacing or cleaning up any item that is the responsibility of the Owner but which responsibility such Owner fails or refuses to discharge (which the Association shall have the right, but not the obligation, to do), or to pay for the cost of repairing, replacing, or cleaning up any item which, although the responsibility of the Association, is necessitated by reason of the willful or negligent act of the Owner, his or her family, tenants or guests, with the cost thereof to be added to and become part of the Owner's next chargeable assessment.

(b)     By the Association.  The Association shall maintain and keep in good repair as a Common Expense the "Area of Common Responsibility," which includes the following:

(i)     all Common Elements, including any Limited Common Elements, but excluding all improvements made to such Limited Common Elements; provided, however, the cost of maintenance and repair of Limited Common Elements may be assessed against the Owner to whom the Limited Common Element is assigned under Paragraph 8(b)(i);

(ii)    periodic painting, staining and/or cleaning of exterior surfaces of the Building, exterior window frames, and entry doors and door frames of the Building, on a schedule to be determined by the Board of Directors;

(iii)   periodic cleaning of exterior window surfaces on a schedule to be determined by the Board of Directors; and

(iv)    life safety (including, but not limited to, interior sprinkler systems) and Building systems.

Subject to the maintenance responsibilities herein provided, any maintenance or repair performed on or to the Common Elements by an Owner or Occupant that is the responsibility of the Association hereunder (including, but not limited to landscaping of Common Elements) shall be performed at the sole expense of such Owner or Occupant, and the Owner or Occupant shall not be entitled to reimbursement from the Association even if the Association accepts the maintenance or repair.

The Association shall repair incidental damage to any Unit resulting from performance of work that is the responsibility of the Association.  As finish levels can have varying degrees, such repairs will be complete only to the extent of being "paint-ready".  Such repair and subsequent cleaning shall be performed based on a reasonableness standard.  In performing its responsibilities hereunder, the Association shall have the authority to delegate to such persons, firms or corporations of its choice, such duties as are approved by the Board of Directors.

- 35 -

Nm:EMERSON2(946963)   q:38,39

Deed Book 41978 Pg  514

The Association shall not be liable for injury or damage to person or property caused by the elements or by the Owner of any Unit, or any other person, or resulting from any utility, rain, snow or ice that may leak or flow from any portion of the Common Elements or from any pipe, drain, conduit, appliance or equipment that the Association is responsible to maintain hereunder, except for injuries or damages arising after the Owner of a Unit has put the Association on notice of a specific leak or flow from any portion of the Common Elements and the Association has failed to exercise due care to correct the leak or flow within a reasonable time thereafter. The Association shall not be liable to the Owner of any Unit or such Owner's Occupant, guest, or family, for loss or damage, by theft or otherwise, of any property that may be stored in or upon any of the Common Elements. The Association shall not be liable to any Owner, or any Owner's Occupant, guest or family for any damage or injury caused in whole or in part by the Association's failure to discharge its responsibilities under this Paragraph where such damage or injury is not a foreseeable, natural result of the Association's failure to discharge its responsibilities. No diminution or abatement of assessments shall be claimed or allowed by reason of any alleged failure of the Association to take some action or perform some function required to be taken or performed by the Association under this Declaration, or for inconvenience or discomfort arising from the making of repairs or improvements that are the responsibility of the Association, or from any action taken by the Association to comply with any law, ordinance, or with any order or directive of any municipal or other governmental authority.

(c)     Failure to Maintain.  If the Board of Directors determines that any Owner has failed or refused to discharge properly his or her obligation with regard to the maintenance, repair, or replacement of items of which he or she is responsible hereunder, then, the Association shall give the Owner written notice of the Owner's failure or refusal and of the Association's right to provide necessary maintenance, repair, or replacement at the Owner's cost and expense. The notice shall set forth with reasonable particularity the maintenance, repair, or replacement deemed necessary by the Board of Directors.

Unless the Board of Directors determines that an emergency exists, the Owner shall have ten (10) days within which to complete maintenance or repair, or if the maintenance or repair is not capable of completion within such time period, to commence replacement or repair within ten (10) days. If the Board determines that: (i) an emergency exists or (ii) that an Owner has not complied with the demand given by the Association as herein provided; then the Association may provide any such maintenance, repair, or replacement at the Owner's sole cost and expense, and such costs shall be added to and become a part of the assessment to which such Owner is subject, shall become and be a lien against the Unit, and shall be collected as provided herein for the collection of assessments.

If the Board determines that the need for maintenance or repair is in the Area of Common Responsibility and is caused through the willful or negligent act of any Owner, or Occupant or their family, guests, lessees, or invitees, then the Association may assess the cost of any such maintenance, repair, or replacement against the Owner's or Occupant's Unit, shall become a lien against the Unit, and shall be collected as provided herein for the collection of assessments.

(d)     Measures Related to Insurance Coverage.

(i)      The Board of Directors, upon resolution, shall have the authority to require all or any Owner(s) to do any act or perform any work involving portions of the Condominium that are the maintenance responsibility of the Owner, which will, in the Board's sole discretion, decrease the possibility of fire or other damage in the Condominium, reduce the insurance premium paid by the Association for any insurance coverage or otherwise assist the Board in procuring or maintaining such insurance coverage. This authority shall include, but need not be limited to, requiring Owners to install and maintain smoke detectors, requiring Owners to certify that they have checked the batteries for their smoke detectors, requiring Owners to allow the Association to inspect the smoke detectors and replace batteries if needed on a schedule to be determined by the Board of Directors,

- 36 -

Nm:EMERSON2(946963)    q:38,40

Deed Book 41978 Pg   515

requiring Owners to make improvements to the Owner's Unit, and such other measures as the Board may reasonably require so long as the cost of such work does not exceed Three Hundred Dollars ($300) per Unit in any twelve (12) month period.

(ii)      In addition to, and not in limitation of, any other rights the Association may have, if any Owner does not comply with any requirement made by the Board of Directors pursuant to subparagraph (d)(i) above, the Association, upon fifteen (15) days' written notice (during which period the Owner may perform the required act or work without further liability), may perform such required act or work at the Owner's sole cost.  Such cost shall be an assessment and a lien against the Unit as provided herein.  The Association shall have all rights necessary to implement the requirements mandated by the Board pursuant to subparagraph (d)(i) of this Paragraph, including, but not limited to, a right of entry during reasonable hours and after reasonable notice to the Owner or Occupant of the Unit, except that access may be had at any time without notice in an emergency situation.

(e)      Mold and/or Mildew.  Mold and/or mildew can grow in any portion of the Condominium that is exposed to elevated levels of moisture.  The Association and each Owner agree to: (i) regularly inspect the parts of the Condominium that they respectively maintain, and which are visible and accessible without having to first remove building components or conduct invasive testing, for the existence of mold, mildew, and/or water intrusion (except when the water intrusion is part of the normal functioning of improvements and appliances such as showers, sinks, dishwashers, and other similar appliances and improvements) and/or water damage; (ii) upon discovery, immediately repair in a good and workmanlike condition the source of any water intrusion in the parts of the Condominium that they respectively maintain; (iii) remediate or replace, in accordance with current industry accepted methods, any building material located in the parts of the Condominium that they respectively maintain that has absorbed water or moisture as a result of water intrusion; and (iv) promptly and regularly remediate, in accordance with current industry accepted methods, all mold and/or mildew discovered in the parts of the Condominium that they respectively maintain.  In addition, except for routine housekeeping items and other *de minimis* matters, the Association agrees to notify the Owners, and each Owner agrees to notify the Association of the discovery of mold, mildew, and/or water intrusion and/or damage in the parts of the Condominium that they respectively maintain. Each Owner further agrees not to block or cover any of the heating, ventilation or air-conditioning ducts located in the Unit.

Notwithstanding anything to the contrary herein, Declarant shall have no obligation to perform any invasive testing or inspections, maintenance or repairs in accordance with this Paragraph 17(e), and shall not be held liable for any loss or damage caused by the failure of the Association or an Owner to perform their obligations herein.

(f)      Inspection Obligations.

(i)      Contract for Services.  In addition to the Association's general maintenance obligations set forth in this Declaration, the Association shall, at all times, contract with (subject to the limitations otherwise set forth in this Declaration) or otherwise retain the services of independent, qualified, licensed individuals or entities to provide the Association with inspection services relative to the maintenance, repair and physical condition of the Condominium.

(ii)      Inspection Responsibilities.  Declarant shall provide the Association with maintenance criteria, maintenance manuals, and warranty requirements for the Building (collectively, the "Maintenance Manual").  The inspector(s) shall inspect component parts of the Building in accordance with the Maintenance Manual.  The Association shall update the

- 37 -

Nm:EMERSON2(946983)   q:38,41

Deed Book 41978 Pg   516

Maintenance Manual on a regular basis. The Association shall be responsible for meeting all requirements under such Maintenance Manual.

(iii)   Schedule of Inspections. Such inspections shall take place at least annually or as recommended in the Maintenance Manual. The inspector(s) shall provide written reports of their inspections to the Association promptly following completion thereof. The written reports shall identify any items of maintenance or repair that either require current action by the Association or will need further review and analysis. The Board shall report the contents of such written reports to the members of the Association at the next meeting of the members following receipt of such written reports or as soon thereafter as reasonably practicable and shall include such written reports in the minutes of the Association. The Board shall promptly cause all matters identified as requiring attention to be maintained, repaired, or otherwise pursued in accordance with prudent business practices and the recommendations of the inspector(s), subject to the financial funding available to the Association through its capital reserve fund or by special assessment as set forth in subparagraph 10(e) hereof.

(iv)   Notice to Declarant. For a period of ten (10) years after the conveyance of the last Unit in the Condominium to an Owner other than Declarant, the Association shall, if requested by Declarant, deliver to the Declarant ten (10) days advance written notice of all such inspections (and an opportunity to be present during such inspection, personally or through an agent) and shall provide the Declarant (or its designee) with a copy of all written reports prepared by the inspectors.

(v)   The provisions of this subparagraph 17(f) shall not apply during the Declarant Control Period.

18.   MORTGAGEE'S RIGHTS.

(a)   Unless at least two-thirds (2/3) of the first Mortgagees and Owners give their consent, the Association or the membership shall not:

(i)   by act or omission seek to abandon or terminate the Condominium;

(ii)   change the pro rata interest or obligations of any individual Unit for the purpose of (A) levying assessments or charges or allocating distributions of hazard insurance proceeds or condemnation awards; or (B) determining the pro rata share of ownership of each Unit in the Common Elements;

(iii)   partition or subdivide any Unit in any manner inconsistent with the provisions of this Declaration;

(iv)   by act or omission seek to abandon, partition, subdivide, encumber, sell, or transfer the Common Elements (the granting of easements or licenses, as authorized herein, shall not be deemed a transfer within the meaning of this clause); or

(v)   use hazard insurance proceeds for losses to any portion of the Condominium (whether to Units or to Common Elements) for other than the repair, replacement, or reconstruction of such portion of the Condominium.

- 38 -

Deed Book 41978 Pg   517

The provisions of this subparagraph shall not be construed to reduce the percentage vote that must be obtained from Mortgagees or Owners where a larger percentage vote is otherwise required by the Act or the Condominium Instruments for any of the actions contained in this Paragraph.

(b)      Where the Mortgagee holding a first Mortgage of record, a secondary purchase money Mortgage of record (provided that neither the grantee nor any successor grantee on the secondary purchase money Mortgage is the seller of the Unit) or other purchaser of a Unit obtains title pursuant to judicial or nonjudicial foreclosure of the Mortgage, it shall not be liable, nor shall the Unit be subject to a lien, for the share of the Common Expenses or assessments by the Association chargeable to such Unit which became due prior to such acquisition of title.  Such unpaid share of Common Expenses or assessments shall be deemed to be Common Expenses collectible from Owners of all the Units, including such acquirer, its successors and assigns.  Additionally, such acquirer shall be responsible for all charges accruing subsequent to the passage of title, including, but not limited to, all charges for the month in which title is passed.

(c)      Upon written request to the Association, identifying the name and address of the holder and the Unit number or address, any Eligible Mortgage Holder will be entitled to timely written notice of:

(i)      any condemnation loss or any casualty loss that affects a material portion of the Condominium or any Unit on which there is a first Mortgage held by such Eligible Mortgage Holder;

(ii)      any delinquency in the payment of assessments or charges owed by an Owner of a Unit subject to a first Mortgage held by such Eligible Mortgage Holder that remains unsatisfied for a period of sixty (60) days, and any default in the performance by an individual Owner of any other obligation under the Condominium Instruments that is not cured within sixty (60) days;

(iii)      any lapse, cancellation, or material modification of any insurance policy or fidelity bond maintained by the Association; or

(iv)      any proposed action that would require the consent of a specified percentage of Eligible Mortgage Holders, as specified herein.

(d)      Upon written request to the Association, identifying the name and address of the holder and the Unit number or address, any Eligible Mortgage Holder, or insurer or guarantor of a first Mortgage on a Unit, will be entitled to timely written notice of:

(i)      any proposed amendment of the Condominium Instruments effecting a change in (a) the boundaries of any Unit or the exclusive easement rights appertaining thereto; (b) the interests in the Common Elements or Limited Common Elements appertaining to any Unit or the liability for Common Expenses appertaining thereto; (c) the number of votes in the Association appertaining to any Unit; or (d) the purposes to which any Unit or the Common Elements are restricted;

(ii)      any proposed termination of the Condominium;

(iii)      any condemnation loss or any casualty loss that affects a material portion of the Condominium or any Unit on which there is a first Mortgage held by such Eligible Mortgage Holder;

(iv)      any delinquency in the payment of assessments or charges owed by an Owner of a Unit subject to a first Mortgage held by such Eligible Mortgage Holder that remains unsatisfied for

- 39 -

Nm:EMERSON2(946963)  q:38,43

Deed Book 41978 Pg  518

a period of sixty (60) days, and any default in the performance by an individual Owner of any other obligation under the Condominium Instruments which is not cured within sixty (60) days;

(v)     any lapse, cancellation, or material modification of any insurance policy or fidelity bond maintained by the Association; or

(vi)    any proposed action that would require the consent of a specified percentage of Eligible Mortgage Holders, as specified herein.

(e)     Any holder of a first Mortgage shall be entitled, upon written request, to receive within a reasonable time after request, a copy of the financial statement of the Association for the immediately preceding fiscal year, free of charge to the Mortgagee so requesting.

(f)     Notwithstanding anything to the contrary herein contained, the provisions of Paragraphs 15 and 16 governing leasing and sales of Units, respectively, shall not apply to impair the right of any first Mortgagee to:

(i)     foreclose or take title to a Unit pursuant to remedies contained in its Mortgage; or

(ii)    take a deed or assignment in lieu of foreclosure; or

(iii)   sell, lease, or otherwise dispose of a Unit acquired by the Mortgagee.

(g)     No Priority.  No provision of this Declaration or the Bylaws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Unit in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Elements.

(h)     Notice to Association.  Upon request, each Owner shall be obligated to furnish to the Association the name and address of any Mortgagee encumbering such Owner's Unit.

(i)     Failure of Mortgagee to Respond.  Any Mortgagee who receives a written request from the Board to respond to any action shall be deemed to have approved such action if the Association does not receive a written response from the Mortgagee within thirty (30) days of the date of the Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

(j)     Construction of this Paragraph.  Nothing contained in this Paragraph shall be construed to reduce the percentage vote that must otherwise be obtained under the Condominium Instruments or Georgia law for any of the actions set forth in this Paragraph.

19.     GENERAL PROVISIONS.

(a)     Supremacy of Master Covenants, the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement.  Every Owner, by acceptance of deed to a Unit, acknowledges that, in addition to being subject to and bound by the Condominium Instruments, he or she is subject to the Master Covenants, the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement.  In addition to all of the rights and obligations which have been conferred or imposed upon the Association pursuant to this Declaration, the Bylaws, or the Articles of Incorporation, the Association shall be entitled to exercise any of the rights conferred upon it and shall be subject to all of the obligations imposed upon it pursuant to the Master Covenants and the Bylaws of the Master Association the Two Buckhead Plaza Covenants, and the

- 40 -

Nm:EMERSON2(946963)   q:38,44

Deed Book 41978 Pg 519

Parking and Easement Agreement. The Association and all committees thereof shall also be subject to all superior rights and powers that have been conferred pursuant to the Master Covenants, the articles of incorporation and the bylaws of the Master Association, the Two Buckhead Plaza Covenants, and the Parking and Easement Agreement. The Association shall take no action in derogation of the rights of or contrary to the interests of the Master Association.

(b)     SECURITY.  THE ASSOCIATION OR THE DECLARANT MAY, BUT SHALL NOT BE REQUIRED TO, FROM TIME TO TIME, PROVIDE MEASURES OR TAKE ACTIONS WHICH DIRECTLY OR INDIRECTLY IMPROVE SECURITY ON THE CONDOMINIUM; HOWEVER, EACH OWNER, FOR HIMSELF OR HERSELF AND HIS OR HER TENANTS, GUESTS, LICENSEES, AND INVITEES, ACKNOWLEDGES AND AGREES THAT NEITHER THE ASSOCIATION NOR THE DECLARANT IS A PROVIDER OF SECURITY AND NEITHER PARTY SHALL HAVE A DUTY TO PROVIDE SECURITY ON THE CONDOMINIUM. FURTHERMORE, THE ASSOCIATION DOES NOT GUARANTEE THAT NON-OWNERS AND NON-OCCUPANTS WILL NOT GAIN ACCESS TO THE CONDOMINIUM AND COMMIT CRIMINAL ACTS ON THE CONDOMINIUM NOR DOES THE ASSOCIATION GUARANTEE THAT CRIMINAL ACTS ON THE CONDOMINIUM WILL NOT BE COMMITTED BY OTHER OWNERS OR OCCUPANTS. IT SHALL BE THE RESPONSIBILITY OF EACH OWNER TO PROTECT HIS OR HER PERSON AND PROPERTY AND ALL RESPONSIBILITY TO PROVIDE SUCH SECURITY SHALL LIE SOLELY WITH EACH OWNER.   NEITHER DECLARANT NOR THE ASSOCIATION SHALL BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OF FAILURE TO PROVIDE ADEQUATE SECURITY OR INEFFECTIVENESS OF SAFETY MEASURES UNDERTAKEN.

(c)     Dispute Resolution.  Prior to filing a lawsuit against the Association, the Board, or any officer, director, or property manager of the Association, an Owner or Occupant must request and attend a hearing with the Board of Directors.  Any such request shall be in writing and shall be personally delivered to any member of the Board of Directors or the property manager, if any, of the Association. The Owner or Occupant shall, in such request and at the hearing, make a good faith effort to explain the grievance to the Board and resolve the dispute in an amicable fashion, and shall give the Board a reasonable opportunity to address the Owner's or Occupant's grievance before filing suit.  Upon receiving a request for a hearing, the Board shall give notice of the date, time and place of the hearing to the person requesting the hearing.  The Board shall schedule this hearing for a date not less than seven (7) or more than twenty-one (21) days from the date of receipt of the request.

(d)     Parking Spaces and Vehicles.  Neither the Declarant nor the Association shall be held liable for any loss or damage arising from theft, vandalism, malicious mischief, or any loss or damage resulting from water or acid damage, to any property placed or kept in any parking space in the Condominium. Each Owner or Occupant with use of a parking space who places or keeps a vehicle and/or any personal property in the vehicle or parking space does so at his or her own risk.

(e)     Unit Keys.  At the request of the Association, each Owner, by acceptance of a deed to a Unit, agrees to provide the Association with a key to the Unit (and the security alarm code, if any) to be used by the Association for maintenance, emergency, life-safety purposes as provided in subparagraph 9(a) of this Declaration (and for pest control, if necessary, as provided in subparagraph 21(e) of this Declaration). The Declarant, the Association, and their respective agents shall not be liable for any loss or damage due to its holding such key, or use of such key for the purposes described above and each Owner shall indemnify and hold harmless the Declarant, the Association and its officers and directors against any and all expenses, including reasonable attorneys' fees, actually incurred by or imposed upon the Declarant, the Association or its officers or directors in connection with any action, suit, or other proceeding (including settlement of any such action, suit or proceeding) brought by the Owner or the Owner's family, tenants, guests, employees,

424858.4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Deed Book 41978 Pg 520

invitees, or licensees against the Declarant, the Association, its officers or directors arising out of or relating to its holding or use of such key for the purposes described above.

(f) <u>Right of Action</u>. All Owners hereby acknowledge and agree that the Association shall not be entitled to institute any legal action against anyone on behalf of any or all of the Owners which is based on any alleged construction defect (as such term is defined in O.C.G.A. § 8-2-36) in any Unit, the Common Elements or the Limited Common Elements, or any damage allegedly sustained by any Owner by reason thereof, except the Association may bring an action against a Contractor to recover damages resulting from construction defects in any of the Common Elements or Limited Common Elements. Such action may be maintained only after:

(i) The Association first obtains the written approval of each Owner whose interest in the Common Elements or Limited Common Elements will be the subject of the action;

(ii) A vote or written agreement of the Owners to which at least a Majority of the votes of the members of the Association are allocated;

(iii) The Board and the Contractor have met in Person and conferred in a good faith attempt to resolve the Association's claim or Contractor has definitively declined or ignored the requests to meet with the Board; and

(iv) The Association has otherwise satisfied all of the pre-action requirements for a claimant to commence an action as set forth in O.C.G.A. § 8-2-35, et seq.

Notwithstanding the above, after the expiration of the Declarant Control Period, the Board of Directors may negotiate the resolution of any alleged defect(s) in the Common Elements or Limited Common Elements on behalf of the Owners and shall have the right and authority to settle and release on behalf of any and all of the Owners claims, causes of action, damages and suits involving the same. Any such settlement and release shall bind all Owners and their successors and assigns. As set forth in Paragraph 22 hereof, no amendment to this Declaration shall (i) modify, alter, or delete any provision of this Declaration that benefits the Declarant or any rights, privileges, easements, protections, or defenses of the Declarant; or (ii) alter the rights of the Owners or the Association in relationship to the Declarant, without the written consent of the Declarant attached to and recorded with such amendment.

(g) <u>Successor Declarants</u>. Any successor to the Declarant shall not be responsible or subject to liability by operation of law or through the purchase of Declarant's interest in the Condominium or any portion thereof at foreclosure or otherwise for any act, omission, or matter occurring or arising from any act, omission, or matter occurring prior to the time the successor succeeded to the interest of the Declarant.

(h) <u>Disclosures</u>. Each Owner and Occupant acknowledges and understands the following:

(i) The Condominium is located adjacent to thoroughfares that may be affected by traffic and noise from time to time and may be improved and/or widened in the future.

(ii) The views and natural light available to a Unit may change over time due to, among other circumstances, additional development and the removal or addition of landscaping.

(iii) The views from a Unit may vary depending upon the Unit's elevation and location within the Building.

- 42 -

Nm:EMERSON2(946963)  q:38,46

Deed Book 41978 Pg  521

(iv)     No representations are made regarding the zoning of adjacent property, or that the category to which adjacent property is zoned may not change in the future.

(v)      No representations are made regarding the schools that currently or may in the future serve the Condominium.

(vi)     Since in every community there are conditions that different people may find objectionable, it is acknowledged that there may be conditions outside of the Condominium that an Owner or Occupant finds objectionable and that it shall be the sole responsibility of the Owners and Occupants to become acquainted with neighborhood conditions that could affect the Unit.

(vii)    Plumbing and concrete, tile and hardwood surfaces within a Unit may transmit noise, and such noise shall not constitute a use of a Unit that interferes with or causes disruption to the use and quiet enjoyment of another Unit by its respective Owner and or Occupant.

(viii)   No representations are made that the Unit is or will be soundproof or that sound may not be transmitted from one Unit to another or from the Common Elements (including, but not limited to, any amenity areas) to a Unit.  Sound transmissions between Units are inherent in multi-family construction and are not a warrantable condition.

(ix)     The Floor Plans and the dimensions and square footage calculations shown thereon are only approximations.  Any Owner that is concerned about any representations regarding the floor plans should do his/her own investigation as to the dimensions, measurements and square footage of his/her Unit.

(x)      Declarant's agents will be constructing portions of the Condominium and engaging in other construction activities related to the construction of Common Elements.  Such construction activities may, from time to time, produce certain conditions on the Condominium, including, without limitation: (A) noise or sound that is objectionable because of its volume, duration, frequency or shrillness; (B) smoke; (C) noxious, toxic, or corrosive fumes or gases; (D) obnoxious odors; (E) dust, dirt or flying ash; (F) unusual fire or explosion hazards; (G) temporary interruption of utilities; and/or (H) other conditions that may threaten the security or safety of Persons on the Condominium. Notwithstanding the foregoing, all Owners and Occupants agree that such conditions on the Condominium resulting from construction activities shall not be deemed a nuisance and shall not cause Declarant and its agents to be deemed in violation of any provision of the Declaration.

(xi)     Exposed concrete surfaces in portions of the Condominium which are not heated and cooled are subject to cracking due to (A) water penetration, (B) expansion and contraction of the concrete with temperature changes, and (C) building settlement.

(xii)    Concrete surfaces in heated and cooled portions of the Condominium are subject to cracking due to building settlement.  Cracks smaller than one-half inch (½") are not warrantable conditions.

(xiii)   The Unit may trap humidity created by general use and occupation of such space (cooking, bathing, laundering etc.). As a result, condensation may appear on the interior portion of windows and glass surfaces and fogging of windows and glass surfaces may occur due to temperature disparities between the interior and exterior portions of the windows and glass. If left unattended and not properly maintained by Owners and Occupants, the condensation may

- 43 -

Nm:EMERSON2(946963)   q:38,47

Deed Book 41978 Pg   522

increase resulting in staining, damage to surrounding seals, caulk, paint, wood work and sheetrock, and potentially, mildew and/or mold (see subparagraph 17(e) hereof).

(xiv)   Declarant shall not be responsible for responding to or taking any affirmative action on behalf of the Association or an individual member of the Association to mitigate, alleviate, remedy or cure any off-site conditions that may directly impact the Condominium or any portion thereof, and such inaction by the Seller shall not constitute a breach of fiduciary duty by the directors and officers of the Association that are appointed by the Declarant during the Declarant Control Period.

(xv)   While the drainage system for surface water runoff on the Condominium will be constructed in accordance with applicable governmental standards, the Condominium may still be subject to erosion and/or flooding during unusually intense or prolonged periods of rain.

(xvi)   Declarant reserves the right to obtain and use photography of the Condominium (including the Unit) for publication and advertising purposes.

(xvii)   The performance and methods and practices of operating heating and cooling systems can be directly affected by the orientation and location of a room or Unit in relation to the sun.  Declarant shall, therefore, have no obligation other than to install a heating and cooling system at the Unit which has been sized and designed based on industry standards for the type and size of unit to be constructed and which functions in accordance with industry standards.

(xviii)   No representations are made that any room, wall, ceiling or floor in any dwelling on the Unit or any pipes located therein will be soundproof.

(xix)   No representations are made that the systems in the Unit including, by way of example only, heating and air conditioning and electrical systems will operate or perform at a level or standard greater than the minimum specifications of the manufacturer.

(xx)   Light may emit from the parking facility located on the Condominium as well as those located on adjacent properties.

(xxi)   Railings constructed of a fiberglass material may "hum" in windy conditions.

(xxii)   Exhaust vents and louvers for venting from bathrooms, kitchens and laundry rooms may be located on or near balconies, and noise, odors and grime may be emitted from such areas.

(xxiii)   The concrete floors in the parking deck flex.

(xxiv)   In connection with an environmental site assessment of the property on which the Condominium is located ("Subject Property"), Professional Service Industries, Inc. ("PSI") identified automobile service stations with underground storage tanks ("USTs") and dry cleaning facilities currently or previously located at nearby properties, including historical data indicating releases of petroleum products and chlorinated hydrocarbons in groundwater migrating towards the Subject Property.  On about July 9, 1993 and May 24, 2001, the Georgia Environmental Protection Division issued, respectively, "No Further Action Required" and "Non Hazardous Site Inventory Listing" letters regarding such releases from nearby USTs and properties.

PSI's environmental site assessment included sampling of soil and groundwater at the Subject Property.  No soil contamination was detected. PSI confirmed the presence of petroleum

- 44 -

Deed Book 41978 Pg 523

products and chlorinated hydrocarbons (benzene, toluene, ethyl benzene, xylenes, and 1,2 dichloroethane) in groundwater at the Subject Property. According to PSI, these groundwater results are consistent with prior information about petroleum products and chlorinated hydrocarbons in groundwater migrating towards the Subject Property. Pursuant to the above-referenced No Further Action Required and Non Hazardous Site Inventory Listing letters, no cleanup of petroleum products and chlorinated hydrocarbons in groundwater at the Subject Property is expected to be required of the Association under applicable environmental laws.

(xxv)   The Condominium is subject to that certain Sewer Easement Agreement by and among Stafford Plaza, LLC, a Georgia limited liability company, and John W. Meshad and George C. Berkow, not individually but as Co-Trustees of the Buckhead Plaza Land Trust, dated April 28, 2004, filed for record April 30, 2004, recorded in Deed Book 37495, Page 418, Fulton County, Georgia Records.

(i)   _Services During Declarant Control._   Each Owner acknowledges that Declarant and its affiliates may provide services utilized by communities such as this Condominium including, but not limited to, management services. Each Owner consents and agrees that the Association may enter into service contracts with Declarant and its affiliates.

(j)   _Use of Names._   No person shall use the name "Ovation, a Condominium" or any derivative of such name in any printed or promotional materials without Declarant's prior written consent. However, Owners may use the name "Ovation, a Condominium" in printed or promotional materials prepared in connection with the sale or rental of their respective Unit where such term is used solely to specify that such Unit is located within Ovation, a Condominium, and the Association shall be entitled to use the words "Ovation, a Condominium" in its name. The Association shall not use any name, mark or symbol of Declarant or its affiliates without prior written consent. Any use by the Association of names, marks or symbols of Declarant or any of its affiliates shall inure to the benefit of Declarant or such affiliate and shall be subject to periodic review for quality control. The Association shall enter into license agreements with Declarant, terminable with or without cause and in a form specified by Declarant in its sole discretion, with respect to any permissive use of any such names, marks or symbols.

20.   EMINENT DOMAIN.

In the event of a taking by condemnation or by eminent domain, the provisions of the Act shall prevail and govern; provided, however, any proceeds received for a taking of the Common Elements (other than Limited Common Elements) by condemnation or eminent domain shall, at the option of the Board, either be allocated to the Owners pursuant to O.C.G.A. § 44-3-97(a), as amended, or be deposited into the Association's operating account or reserve account to be applied to Common Expenses. Each holder of a first Mortgage shall be entitled to written notice of any such condemnation proceedings, and nothing in the Condominium Instruments shall be construed to give a priority to any Owner in the distribution of proceeds to such Unit.

21.   EASEMENTS.

(a)   _Use and Enjoyment._   Each Owner and Occupant shall have a right and a non-exclusive easement of use and enjoyment in and to the Common Elements (including the right of access, ingress and egress to and from his or her Unit over those portions of the Condominium designated for such purpose), and such non-exclusive easement shall be appurtenant to and shall pass with the title to such Unit, subject to (i) the rights of the Owners to the exclusive use of the Limited Common Elements assigned to their respective Units; (ii) to the right of the Association to control the use and enjoyment of the Common

- 45 -

Nm:EMERSON2(946963)    q:38,49

Deed Book 41978 Pg   524

Elements as provided by the terms of this Declaration including, but not limited to, the right of the Association to suspend voting and use privileges as provided herein; and (iii) the right of the Association to have access to the Units and Limited Common Elements assigned to a Unit to discharge its rights and obligations, under the Condominium Instruments, including without limitation, the maintenance responsibility of the Association.

(b)     Support.  Every portion of a Unit and all Limited Common Elements contributing to the support of an abutting Unit shall be burdened with a non-exclusive easement of support for the benefit of such abutting Unit.

(c)     Encroachments.   The Units and Common Elements shall be subject to non-exclusive easements of encroachment as set forth in the Act.

(d)     Utilities.  To the extent that the sprinkler system or any utility line, pipe, wire, or conduit serving any Unit, Units or the Common Elements shall lie wholly or partially within the boundaries of another Unit or the Common Elements, such other Unit, Units, or the Common Elements shall be burdened with a non-exclusive easement for the use, maintenance, repair and replacement of such sprinkler system, utility line, pipe, wire or conduit, such non-exclusive easement to be in favor of the Unit, Units, or Common Elements served by the same and the Association.  It shall be the obligation of the benefited Owner to maintain, replace and repair any pipe, line, conduit, duct or wire owned by such Owner, even if such pipe, line conduit, duct or wire is located within the boundaries of a Unit of another Owner.   In such circumstance, the benefited Owner shall repair all incidental damage to any Unit resulting from performance of any such work.  All Owners hereby covenant and agree that as finish levels can have varying degrees, such repairs will be complete only to the extent of being "paint-ready".  Components that may require repair or replacement, such as tile and trim, will be reinstalled only to the extent of readily available materials or similar materials (trim and such will also be finished to "paint-ready").  Due to the uncontrollability of quality of repair, items such as faux paint treatment, wallpaper, ceiling/wall appliqué, and any other similar types of finishes, will not be the responsibility of the benefited Owner.

(e)     Pest Control.  The Association may but shall not be obligated to dispense chemicals for the extermination of insects and pests within the Units and Common Elements.  In the event the Association chooses to provide such pest control, the Association and its duly authorized contractors, representatives, and agents shall have an easement to enter Units for the purpose of dispensing chemicals for the exterminating of insects and pests within the Units and Common Elements.  Owners shall either provide a key to the Unit for purpose of such entry or have someone available at such times as are designated by the Board of Directors to allow entry into the Unit for this purpose. The Association shall not be liable for any illness, damage, or injury caused by the dispensing of these chemicals for this purpose.

(f)     Community Bulletin Board.   As part of the Common Elements maintained by the Association, Declarant and/or the Board shall have the right, but not the obligation, to erect on the Condominium a bulletin board primarily for the use of Owners in advertising their Units for sale.  For so long as the Association desires to maintain this bulletin board, each Owner and his licensed real estate broker and agent may use the Condominium for access, ingress and egress to and from this bulletin board; provided, however, the use of the bulletin board shall be subject to such reasonable nondiscriminatory rules and regulations as may be adopted or promulgated by the Board regulating the size and duration of such advertisements.  Declarant or Board may terminate use of this bulletin board entirely at any time, and no property rights of any kind are created hereby.

424858 4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963)  q:38,50 

Deed Book 41978 Pg   525

(g)   Easements Reserved to the Declarant.

(i)   Marketing and Sales.  For so long as Declarant owns any Unit primarily for the purpose of sale, Declarant and its duly authorized contractors, subcontractors, representatives, agents, associates, employees, tenants and successors and assigns shall have: (A) a non-exclusive easement for access and ingress to, egress from and use of the Common Elements for the placement and maintenance of signs, banners, balloons, decorations, marketing materials and tables, a sales office, a leasing office, a business office, promotional facilities and model Units on any portion of the Condominium, together with such other facilities as in the opinion of Declarant may be reasonably required, convenient or incidental to the completion, renovation, improvement, development, sale or lease of any Unit, or any portion thereof; and (B) a non-exclusive easement to use and enjoy the Common Elements for special events, promotional activities and grand opening celebrations.  In connection with the hosting of special events, promotional activities and grand opening celebrations in the Common Elements, Declarant shall be permitted to have live entertainment, and any noise created therefrom shall not be deemed a nuisance and shall not cause Declarant and its representatives, agents, associates, employees, tenants and guests to be deemed in violation of any provision of this Declaration.

Additionally, Declarant and its duly authorized contractors, subcontractors, representatives, agents, associates, employees, tenants and successors and assigns, shall have an exclusive easement for any and all purposes it deems appropriate over, on and through Declarant's Easement Area so long as Declarant, or any successor Declarant, owns any Unit for the purpose of sale or lease.

(ii)   Telecommunications Easement.  Declarant hereby reserves an exclusive, perpetual and irrevocable easement, right and license for itself and its successors, assigns and Permittees to use, sell, lease or assign all or any portion of the Telecommunications Easement Area, for the construction, installation, use, maintenance, repair, replacement, improvement, removal and operation ("Telecommunications Activity") of telecommunications equipment, including without limitation, broadcast antennae and related equipment, cell tower equipment, or other wireless communication antennae and related equipment, cable or satellite television equipment and equipment for high-speed internet access (hereinafter collectively referred to as the "Telecommunications Equipment") (the "Telecommunications Easement").  Declarant, for itself and its successors-in-title, assigns and Permittees, also reserves a non-exclusive, perpetual and irrevocable easement right and license over the Telecommunications Easement Area to exercise its rights set forth above.  Without limitation, this easement, right and license shall include the right by Declarant and its successors-in-title, assigns and Permittees to construct, install, use, maintain, repair, replace, improve, remove and operate any type of Telecommunications Equipment on the Telecommunications Easement Area.  In addition, Declarant, for itself and its successors-in-title, assigns and Permittees, reserves a non-exclusive, perpetual and irrevocable easement to use the chases, elevator machine rooms, electrical rooms and telephone/telecommunications rooms to install, service, connect and operating any Telecommunications Equipment and over other portions of the Building for access to and from the Telecommunications Easement Area and to construct, install, use, maintain, repair, replace, improve, remove, operate and license or allow others to do the same, any utility lines servicing the Telecommunications Equipment, including the right to utilize electrical power from the Condominium, but subject to the right of the Association to charge for the actual costs of such electrical power and any submetering costs associated with determining such costs.  Declarant and the Association hereby agree to indemnify each other for any damage or destruction caused to the property of the other in the exercise of any easement rights granted under this subparagraph.  Declarant shall have and hereby reserves unto it and its successors-in-title, assigns and Permittees the sole and exclusive right to collect and retain any and all income received from or in connection with the rights described in this subparagraph.  The rights reserved to

- 47 -

Nm:EMERSON2(946963), g:38,51

Deed Book 41978 Pg  526

Declarant under this subparagraph shall benefit only Declarant and its successors-in-title, assigns and Permittees, and no Owner or successor-in-title to any portion of the Condominium shall have any rights with respect to Telecommunications Easement Area or to any income derived from or in connection with the easements granted in this subparagraph, except as expressly provided in the last sentence of this subparagraph.

Notwithstanding anything to the contrary contained herein, the provisions of this subparagraph 21(g)(ii) shall not be amended without the consent of the Declarant.

(iii)    Inspection.   Declarant hereby reserves a perpetual, non-exclusive easement for the purpose of access for ingress and egress over the Condominium, including the Units, the Common Elements, and Limited Common Elements, to inspect, examine, survey, photograph, and perform such tests, inspections, studies or other evaluations of the Condominium as Declarant and its agents, employees or contractors, or others may deem necessary in conjunction with Declarant's review of construction conditions on the Condominium.  The foregoing easement shall expire upon the occurrence of the later of the following events: (A) the date upon which the Declarant no longer owns any Unit; (B) the date upon which the Declarant Control Period expires; or (C) ten (10) years after the date on which this Declaration is recorded in the Official Records.  To the extent that damage is inflicted on the Common Elements, Limited Common Elements, or on any Unit through which access is taken, the Declarant, whether by it or through agents, employees, contractors, or others, shall be liable for the prompt repair thereof.

22.    AMENDMENTS.

Except where a higher vote is required for action under any other provision of this Declaration or by the Act, in which case such higher vote shall be necessary to amend such provision, this Declaration may be amended by the affirmative vote, written consent, or any combination of affirmative vote and written consent of the members of the Association holding two-thirds (2/3) of the Total Association Vote and such amendment shall otherwise comply with the provisions of Section 44-3-93 of the Act.  Moreover, no amendment to this Declaration shall modify, alter, abridge, or delete any: (a) provision of this Declaration that benefits the Declarant; (b) rights, privileges, easements, protections, or defenses of the Declarant; or (c) rights of the Owners or the Association in relationship to the Declarant, without the written consent of the Declarant attached to and recorded with such amendment, until the later of the following: (i) the date upon which the Declarant no longer owns any Unit; or (ii) ten (10) years after the date on which this Declaration is recorded in the Official Records, whichever period of time is longer.

Notice of any meeting at which a proposed amendment will be considered shall state the fact of consideration and the subject matter of the proposed amendment.  No amendment shall be effective until certified by the president and secretary of the Association and recorded in the Fulton County, Georgia land records.

In addition to the above, material amendments to this Declaration must be approved by Eligible Mortgage Holders who represent at least fifty-one percent (51%) of the votes of Units that are subject to Mortgages held by Eligible Mortgage Holders.  Notwithstanding the above, the approval of any proposed amendment by an Eligible Mortgage Holder shall be deemed implied and consented to if the Eligible Mortgage Holder fails to submit a response to any written proposal for an amendment within thirty (30) days after the Eligible Mortgage Holder receives notice of the proposed amendment sent by certified or registered mail, return receipt requested. Material amendments are those that establish, provide for, govern or regulate any of the following:

- 48 -

Nm:EMERSON2(946963),  q:38,52

Deed Book 41978 Pg 527

    (a)      Voting;

    (b)      Assessments, assessment liens or subordination of such liens;

    (c)      Reserves for maintenance, repair and replacement of the Common Elements;

    (d)      Insurance or fidelity bonds;

    (e)      Rights to use of the Common Elements;

    (f)      Responsibility for maintenance and repair of the Condominium;

    (g)      Expansion or contraction of the Condominium or the addition, annexation or withdrawal of property to or from the Condominium;

    (h)      Boundaries of any Unit;

    (i)      The interests in the Common Elements or Limited Common Elements;

    (j)      Convertibility of Units into Common Elements or of Common Elements into Units;

    (k)      Leasing of Units;

    (l)      Imposition of any right of first refusal or similar restriction on the right of an Owner to sell, transfer, or otherwise convey his or her Unit in the Condominium;

    (m)      Establishment of self-management by the Association where professional management has been required by any of the agencies or corporations set forth below;

    (n)      Amendment of any provisions that are for the express benefit of Eligible Mortgage holders or insurers or guarantors of first Mortgages on Units in the Condominium; and

    (o)      Restoration or repair of the Condominium (after damage or partial condemnation) in a manner other than that specified in the Condominium Instruments.

Notwithstanding the foregoing, Declarant or the Board of Directors, without the necessity of a vote from the Owners, may unilaterally amend this Declaration to: (a) correct any scriveners errors; (b) bring any provision of this Declaration into compliance with any applicable governmental statute, rule, regulation, judicial determination rules and regulations of the Federal National Mortgage Association ("Fannie Mae"), the Department of Housing and Urban Development ("HUD") and the Veterans Administration ("VA") pursuant to federal law that shall be in conflict therewith; and (c) enable any reputable title insurance company to issue title insurance coverage with respect to any portion of the Condominium.

Any action to challenge the validity of an amendment adopted under this Paragraph must be brought within one (1) year of the effective date of such amendment.  No action to challenge such amendment may be brought after such time.

42485R.4 / 10205 003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), q:38,53

Deed Book 41978 Pg 528

23.   SEVERABILITY.

Invalidation of any one of these covenants or restrictions by judgment or court order or otherwise shall in no way affect the application of such provision to other circumstances or affect any other provision(s), which shall remain in full force and effect.

24.   DECLARANT RIGHTS.

Notwithstanding anything to the contrary herein, and in addition to Declarant's right to appoint and remove officers and directors under Article III, Part A, Section 2 of the Bylaws and other rights set forth herein, Declarant shall have the right, as long as Declarant owns at least one (1) Unit, to conduct such sales, marketing, leasing, administrative and other activities at the Condominium as Declarant deems appropriate for the sale, marketing or leasing of any Unit and Declarant shall have a non-exclusive easement right across the Common Elements to erect signs, banners, balloons and other decorations and to conduct such other sales, marketing and leasing activities as provided herein.  The expiration of the Declarant Control Period shall not terminate or alter the status of the above-referenced entity and its respective successors-in-title and assigns as the Declarant hereunder or divest the Declarant of other rights specifically reserved to the Declarant herein.

25.   PREPARER.

This Declaration was prepared by Linda B. Curry and Jane C. Kotake, Weissman, Nowack, Curry & Wilco, P.C., One Alliance Center, 4th Floor, 3500 Lenox Road, Atlanta, Georgia 30326.

[SIGNATURES ON FOLLOWING PAGE]

424858 4 / 10205.003 (formerly 319485-6)
Ovation, a Condominium

Nm:EMERSON2(946963), q:38,54

Deed Book 41978 Pg 529

IN WITNESS WHEREOF, Declarant has executed this Declaration under seal this 15 day of
FEBRUARY , 200 6 .

DECLARANT:

BP APARTMENTS HOLDINGS, LLC,
a Delaware limited liability company

By:     TCR BP RESIDENTIAL LIMITED
        PARTNERSHIP, a Texas limited
        partnership, its member

        By:     TCR BUCKHEAD RESIDENTIAL,
                INC., a Texas corporation, its general
                partner

                By: _____
                Name:  Alan P. Dean
                Title: VICE PRESIDENT

Signed, sealed, and delivered
this 15 day of February , 200 6
in the presence of:

_____
Witness

_____
Notary Public
[NOTARY SEAL]

JANET F. REAVIS
NOTARY
EXPIRES
GEORGIA
FEB. 24, 2009
PUBLIC
PAULDING COUNTY

- 51 -

Nm:EMERSON2(946963), ⌐a:38,55

Deed Book 41978 Pg 530

## EXHIBIT "A"
## DESCRIPTION OF SUBMITTED PROPERTY

### Parcel "1"
### Parking Deck Below 1003 Level
### Level 1003 and Below

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a distance of 486.59 feet to a ½-inch rebar found; thence running North 68 degrees 44 minutes 59 seconds West a distance of 16.45 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 50.00 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, running thence North 21 degrees 15 minutes 01 seconds East a distance of 10.01 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 21.94 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 161.98 feet to a point; Thence running North 38 degrees 13 minutes 45 seconds East a distance of 19.19 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 23.67 feet to a point; Thence running North 21 degrees 30 minutes 48 seconds East a distance of 47.44 feet to a point; Thence running South 68 degrees 32 minutes 49 seconds East a distance of 175.03 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 5.32 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 178.67 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 182.67 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 57.11 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 59.81 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 304.13 feet to a point and The True Point of Beginning;

Said tract containing 1.9931 acres (86,820 square feet) and being the same property shown as Parcel "A" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor No. 2257, dated May 22, 2002, last revised April 14, 2004.

### LESS AND EXCEPT THE FOLLOWING OUT-PARCEL:

### Stafford Truck Dock Out Parcel
### 991 Level and Below

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

Nm:EMERSON2(946963), q:38.56

Deed Book 41978 Pg 531

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a distance of 486.59 feet to a ½-inch rebar found; thence running North 68 degrees 44 minutes 59 seconds West a distance of 16.45 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 50.00 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 10.01 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 21.94 feet to a point; THENCE running North 21 degrees 15 minutes 01 seconds East a distance of 161.98 feet to a point; THENCE running North 38 degrees 13 minutes 45 seconds East a distance of 19.19 feet to a point; THENCE running South 68 degrees 44 minutes 59 seconds East a distance of 23.67 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, running thence North 21 degrees 30 minutes 48 seconds East a distance of 47.44 feet to a point; Thence running South 68 degrees 32 minutes 49 seconds East a distance of 175.03 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 5.32 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 35.33 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 19.64 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 9.33 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 41.25 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 201.29 feet to a point; Thence running North 21 degrees 30 minutes 48 seconds East a distance of 8.75 feet to a point and The True Point of Beginning;

Said tract containing 0.2652 acres (11,554 square feet) and being the same property shown as Parcel "B" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor No. 2257, dated May 22, 2002, last revised April 14, 2004.

**Parcel "2"**
**"1003 LEVEL" "Land Plat"**
**Level 1003 to 1012**

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a

Nm:EMERSON2(946963),   q:38,57

Deed Book 41978 Pg  532

distance of 486.59 feet to a ½-inch rebar found; thence running North 68 degrees 44 minutes 59 seconds West a distance of 16.45 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 50.00 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, running thence North 21 degrees 15 minutes 01 seconds East a distance of 10.01 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 21.94 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 161.98 feet to a point; Thence running North 38 degrees 13 minutes 45 seconds East a distance of 10.94 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 65.01 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 61.49 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 204.15 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 38.96 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 53.72 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 82.00 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 304.13 feet to a point and The True Point of Beginning.

Said tract containing 0.9483 acres (41,307 square feet) and being the same property shown as Parcel "C" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor No. 2257, dated May 22, 2002, last revised April 14, 2004.

**Parcel "3"**
**1012 LEVEL**
**Level 1012 and Above**

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a distance of 486.59 feet to a ½-inch rebar found; thence running North 68 degrees 44 minutes 59 seconds West a distance of 16.45 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 50.00 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, running thence North 21 degrees 15 minutes 01 seconds East a distance of 10.01 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 21.94 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 161.98 feet to a point; Thence running North 38 degrees 13 minutes 45 seconds East a distance of 10.94 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 19.99 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 61.49 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 249.17 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 38.96 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 53.72 feet to a point; Thence running South 21 degrees 15 minutes 01

Nm:EMERSON2(946963), q:38,58

Deed Book 41978 Pg 533

seconds West a distance of 82.00 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 304.13 feet to a point and The True Point of Beginning.

Said tract contains 0.8847 acres (38,538 square feet) and being the same property shown as Parcel "D" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor No. 2257, dated May 22, 2002, last revised April 14, 2004.

## LESS AND EXCEPT THE FOLLOWING TWO OUT-PARCELS:

### 1012 Level Out Parcel
### 1012 Level to 1021 Level

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence continuing along said right-of-way along a curve to the right an arc distance of 50.25 feet (said arc having a radius of 838.14 feet and being subtended by a chord 50.24 feet in length lying to the southeast of said arc and bearing North 26 degrees 49 minutes 28 seconds East) to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a distance of 203.79 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 82.00 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 53.72 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, running thence South 21 degrees 15 minutes 01 seconds West a distance of 4.79 feet to a point; Thence running North 68 degrees 44 minutes 59 seconds West a distance of 176.03 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 43.75 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 176.03 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 38.96 feet to a point and The True Point of Beginning.

Said tract contains 0.1768 acres (7,701 square feet) and being the same property shown as Parcel "E" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor N. 2257, dated May 22, 2002, last revised April 14, 2004.

### 1012, 1021 & 1030 Levels Out Parcel
### 1012 Level to 1039 Level

All that tract or parcel of land lying and being in land lot 99 of the 17th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

Exhibit "A" – Page 4

Nm:EMERSON2(946963)    q:38,59

Deed Book 41978 Pg 534

A three-dimensional parcel of air space having its top horizontal plane located at the 1003 Level based on the North American Vertical Datum 1988, as established by National Geodetic Survey ("NAVD88") and having the sides of such parcel of air space being perpendicular to and below such horizontal plane and within the boundaries of the following described property:

To find The True Point of Beginning, commence at a 1-inch crimp top pipe found on the northwesterly right-of-way of Peachtree Road (having a varied right-of-way) located 438.2 feet as measured northwesterly along said right-of-way from its intersection with the northerly line of land lot 100; thence running along said right-of-way North 68 degrees 44 minutes 59 seconds West a distance of 14.03 feet to a point; thence continuing along said right-of-way along a curve to the right an arc distance of 50.25 feet (said arc having a radius of 838.14 feet and being subtended by a chord 50.24 feet in length lying to the southeast of said arc and bearing North 26 degrees 49 minutes 28 seconds East) to a point; thence leaving said right-of-way and running North 68 degrees 44 minutes 59 seconds West a distance of 203.79 feet to a point; thence running North 21 degrees 15 minutes 01 seconds East a distance of 82.00 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 53.72 feet to a point; thence running South 21 degrees 15 minutes 01 seconds West a distance of 4.79 feet to a point; thence running North 68 degrees 44 minutes 59 seconds West a distance of 176.03 feet to a point and The True Point of Beginning; From The True Point of Beginning thus established, run thence North 68 degrees 44 minutes 59 seconds West a distance of 73.14 feet to a point; Thence running North 21 degrees 15 minutes 01 seconds East a distance of 43.75 feet to a point; Thence running South 68 degrees 44 minutes 59 seconds East a distance of 73.14 feet to a point; Thence running South 21 degrees 15 minutes 01 seconds West a distance of 43.75 feet to a point and The True Point of Beginning.

Said tract containing 0.0735 acres (3,200 square feet) and being the same property shown as Parcel "F" on that certain survey entitled "ALTA/ACSM Land Title Survey for TCR BP Residential Limited Partnership, The Prudential Insurance Company of America, Bank of America, N.A., and Chicago Title Insurance Company," prepared by Lowe Engineers, bearing the seal and certification of William J. Daniel, III, Georgia Registered Land Surveyor N. 2257, dated May 22, 2002, last revised April 14, 2004.

**TOGETHER WITH** and benefiting the subject property, the easements benefiting the subject property created by virtue of the following:

(a)     Reciprocal Easement Agreement between Peachtree Paces Associates, a Georgia general partnership composed of Taylor & Mathis of Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation, One Buckhead Plaza Associates, a Georgia limited partnership, composed of Taylor & Mathis/One Buckhead, Ltd., a Georgia general partnership, and Metropolitan Life Insurance Company, a New York corporation, Taylor & Mathis IV, a Georgia general partnership composed of T. Harvey Mathis, Charles McKenzie Taylor, James D. Fluker, Jr., E. H. Avery, Harvey M. Cheatam, and Andrew McKenzie Taylor, and Fulton Federal Savings and Loan Association of Atlanta, dated June 11, 1986, filed for record June 12, 1986 at 12:48 p.m., recorded in Deed Book 10149, Page 394, Records of Fulton County, Georgia; as affected by Agreement Reaffirming Easements by and between John W. Meshad and George C. Berkow, not individually, but as Co-Trustees of The Buckhead Plaza Land Trust, and Stafford Plaza, LLC, a Georgia limited liability company, dated as of June 6, 2002, filed for record June 6, 2002 at 3:47 p.m., recorded in Deed Book 32521, Page 517, aforesaid Records.

(b)     Reciprocal Easement Agreement between Taylor & Mathis of Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation, d.b.a. Peachtree Paces Associates, a joint venture organized as a Georgia general partnership, One Buckhead Plaza Associates, a joint venture organized as a Georgia general partnership with Taylor & Mathis/One Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance

Nm:EMERSON2(946963)  ᵃq:38,60

Deed Book 41978 Pg 535

Company, a New York corporation, as its sole partners, and The First National Bank of Atlanta, dated October 28, 1988, filed for record November 2, 1988 at 3:15 p.m., recorded in Deed Book 12015, Page 333, aforesaid Records; as amended by First Amendment to Reciprocal Easement Agreement between Taylor & Mathis of Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation, d.b.a. Peachtree Paces Associates, a joint venture organized as a Georgia general partnership, One Buckhead Plaza Associates, a joint venture organized as a Georgia general partnership with Taylor & Mathis/One Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation, as its sole partners, and The First National Bank of Atlanta, dated October 10, 1990, filed for record October 11, 1990 at 11:14 a.m., recorded in Deed Book 13787, Page 178, aforesaid Records; as affected by Agreement Reaffirming Easements by and between John W. Meshad and George C. Berkow, not individually, but as Co-Trustees of The Buckhead Plaza Land Trust, and Stafford Plaza, LLC, a Georgia limited liability company, dated as of June 6, 2002, filed for record June 6, 2002 at 3:47 p.m., recorded in Deed Book 32521, Page 517, aforesaid Records.

(c)    Agreement Respecting Access by and among Taylor & Mathis of Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation, together doing business as Peachtree Paces Associates, a Georgia joint venture; One Buckhead Plaza Associates, a Georgia general partnership between Taylor & Mathis/One Buckhead, Ltd., a Georgia limited partnership, and Metropolitan Life Insurance Company, a New York corporation; and 3030 Peachtree, L.L.C., a Georgia limited liability company, dated March 3, 1995, filed for record March 28, 1995 at 11:26 a.m., recorded in Deed Book 19390, Page 182, aforesaid Records; as affected by Agreement Reaffirming Easements by and between John W. Meshad and George C. Berkow, not individually, but as Co-Trustees of The Buckhead Plaza Land Trust, and Stafford Plaza, LLC, a Georgia limited liability company, dated as of June 6, 2002, filed for record June 6, 2002 at 3:47 p.m., recorded in Deed Book 32521, Page 517, aforesaid Records.

(d)    Dedication, Agreement Respecting Easements and Cost Sharing Agreement by (i) Metropolitan Life Insurance Company, a New York corporation, and Taylor & Mathis of Buckhead, Ltd., a Georgia limited partnership, together doing business of Peachtree Paces Associates, a Georgia joint venture; and (ii) One Buckhead Plaza Associates, a Georgia general partnership, dated November 15, 1995, filed for record November 15, 1995 at 3:21 p.m., recorded in Deed Book 20252, Page 5, aforesaid Records; as affected by Agreement Reaffirming Easements by and between John W. Meshad and George C. Berkow, not individually, but as Co-Trustees of The Buckhead Plaza Land Trust, and Stafford Plaza, LLC, a Georgia limited liability company, dated as of June 6, 2002, filed for record June 6, 2002 at 3:47 p.m., recorded in Deed Book 32521, Page 517, aforesaid Records; as further affected by Consent and Encroachment Agreement by and among TCR BP Residential Limited Partnership, Stafford Plaza, LLC, SP One Buckhead Plaza, and John W. Meshad and George C. Berkow, not individually, but as Co-Trustees of The Buckhead Plaza Land Trust, dated April 28, 2004, recorded or to be recorded in the aforesaid Records.

(e)    Declaration of Covenants, Conditions, Restrictions and Easements by and between Stafford Plaza, LLC, a Georgia limited liability company, and TCR BP Residential Limited Partnership, a Texas limited partnership, dated April 28, 2004, recorded or to be recorded in the aforesaid Records.

(f)    Declaration of Covenants, Conditions, Restrictions and Easements by and between Stafford Plaza, LLC, a Georgia limited liability company, and TCR BP Residential Limited Partnership, a

Nm:EMERSON2(946965), Rc:38.81

Deed Book 41978 Pg   536

Texas limited partnership, and SP One Buckhead Plaza, LLC, a Delaware limited liability company, dated April 28, 2004, recorded or to be recorded in the aforesaid Records.

(g)     Parking and Easement Agreement for Buckhead Village by and between TCR BP Residential Limited Partnership, a Texas limited partnership, and Stafford Plaza, LLC, a Georgia limited liability company, dated April 28, 2004, recorded or to be recorded in the aforesaid Records.

(h)     Sewer Easement Agreement by and among Stafford Plaza, LLC, a Georgia limited liability company, and John W. Meshad and George C. Berkow, not individually but as Co-Trustees of the Buckhead Plaza Land Trust, dated April 28, 2004, recorded or to be recorded in the aforesaid Records.

Nm:EMERSON2(946963), Rq:38,62

Deed Book 41978 Pg 537

## EXHIBIT "B"

### Undivided Percentage Interest In The Common Elements
### And Liabilities For Common Expenses

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 201 | B1B | .383% |
| 202 | A2 | .320% |
| 203 | B2B | .502% |
| 204 | B2 | .502% |
| 205 | E1 | .256% |
| 206 | A3 | .320% |
| 207 | A3D | .320% |
| 208 | A3C | .320% |
| 209 | A3A | .320% |
| 210 | E1A | .256% |
| 211 | B2C | .502% |
| 212 | B2A | .502% |
| 213 | A1 | .320% |
| 214 | A3B | .320% |
| 215 | B1A | .383% |
| 301 | B1B | .383% |
| 302 | A2 | .320% |
| 303 | B2B | .502% |
| 304 | B2 | .502% |
| 305 | E1 | .256% |
| 306 | A3 | .320% |
| 307 | A3D | .320% |
| 308 | A3C | .320% |
| 309 | A3A | .320% |
| 310 | E1A | .256% |
| 311 | B2C | .502% |
| 312 | B2A | .502% |
| 313 | A1 | .320% |
| 314 | A3B | .320% |
| 315 | B1A | .383% |
| 401 | B1B | .383% |
| 402 | A2 | .320% |
| 403 | B2B | .502% |
| 404 | B2 | .502% |
| 405 | E1 | .256% |
| 406 | A3 | .320% |
| 407 | A3D | .320% |
| 408 | A3C | .320% |
| 409 | A3A | .320% |
| 410 | E1A | .256% |
| 411 | B2C | .502% |
| 412 | B2A | .502% |
| 413 | A1 | .320% |
| 414 | A3B | .320% |
| 415 | B1A | .383% |
| 501 | B1B | .383% |

Exhibit "B" – Page 1

Deed Book 41978 Pg 538

## EXHIBIT "B"

### Undivided Percentage Interest In The Common Elements
### And Liabilities For Common Expenses

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 502 | A2 | .320% |
| 503 | B2B | .503% |
| 504 | B2 | .503% |
| 505 | E1 | .256% |
| 506 | A3 | .320% |
| 507 | A3D | .320% |
| 508 | A3C | .320% |
| 509 | A3A | .320% |
| 510 | E1A | .256% |
| 511 | B2C | .503% |
| 512 | B2A | .503% |
| 513 | A1 | .320% |
| 514 | A3B | .320% |
| 515 | B1A | .383% |
| 601 | B1B | .383% |
| 602 | A2 | .320% |
| 603 | B2B | .503% |
| 604 | B2 | .503% |
| 605 | E1 | .256% |
| 606 | A3 | .320% |
| 607 | A3D | .320% |
| 608 | A3C | .320% |
| 609 | A3A | .320% |
| 610 | E1A | .256% |
| 611 | B2C | .503% |
| 612 | B2A | .503% |
| 613 | A1 | .320% |
| 614 | A3B | .320% |
| 615 | B1A | .383% |
| 701 | B1B | .383% |
| 702 | A2 | .320% |
| 703 | B2B | .503% |
| 704 | B2 | .503% |
| 705 | E1 | .256% |
| 706 | A3 | .320% |
| 707 | A3D | .320% |
| 708 | A3C | .320% |
| 709 | A3A | .320% |
| 710 | E1A | .256% |
| 711 | B2C | .503% |
| 712 | B2A | .503% |
| 713 | A1 | .320% |
| 714 | A3B | .320% |
| 715 | B1A | .383% |
| 801 | B1B | .383% |
| 802 | A2 | .320% |



Deed Book 41978 Pg 539

**EXHIBIT "B"**

**Undivided Percentage Interest In The Common Elements
And Liabilities For Common Expenses**

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 803 | B2B | .503% |
| 804 | B2 | .503% |
| 805 | E1 | .256% |
| 806 | A3 | .320% |
| 807 | A3D | .320% |
| 808 | A3C | .320% |
| 809 | A3A | .320% |
| 810 | E1A | .256% |
| 811 | B2C | .503% |
| 812 | B2A | .503% |
| 813 | A1 | .320% |
| 814 | A3B | .320% |
| 815 | B1A | .383% |
| 901 | B1B | .383% |
| 902 | A2 | .320% |
| 903 | B2B | .503% |
| 904 | B2 | .503% |
| 905 | E1 | .256% |
| 906 | A3 | .320% |
| 907 | A3D | .320% |
| 908 | A3C | .320% |
| 909 | A3A | .320% |
| 910 | E1A | .256% |
| 911 | B2C | .503% |
| 912 | B2A | .503% |
| 913 | A1 | .320% |
| 914 | A3B | .320% |
| 915 | B1A | .383% |
| 1001 | B1B | .383% |
| 1002 | A2 | .320% |
| 1003 | B2B | .503% |
| 1004 | B2 | .503% |
| 1005 | E1 | .256% |
| 1006 | A3 | .320% |
| 1007 | A3D | .320% |
| 1008 | A3C | .320% |
| 1009 | A3A | .320% |
| 1010 | E1A | .256% |
| 1011 | B2C | .503% |
| 1012 | B2A | .503% |
| 1013 | A1 | .320% |
| 1014 | A3B | .320% |
| 1015 | B1A | .383% |
| 1101 | B1B | .383% |
| 1102 | A2 | .320% |
| 1103 | B2B | .503% |
| 1104 | B2 | .503% |

Nm:EMERSON2(946963),Rq:38,65

**EXHIBIT "B"**

Deed Book 41978 Pg 540

**Undivided Percentage Interest In The Common Elements**
**And Liabilities For Common Expenses**

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 1105 | E1 | .256% |
| 1106 | A3 | .320% |
| 1107 | A3D | .320% |
| 1108 | A3C | .320% |
| 1109 | A3A | .320% |
| 1110 | E1A | .256% |
| 1111 | B2C | .503% |
| 1112 | B2A | .503% |
| 1113 | A1 | .320% |
| 1114 | A3B | .320% |
| 1115 | B1A | .383% |
| 1201 | B1B | .383% |
| 1202 | A2 | .320% |
| 1203 | B2B | .503% |
| 1204 | B2 | .503% |
| 1205 | E1 | .256% |
| 1206 | A3 | .320% |
| 1207 | A3D | .320% |
| 1208 | A3C | .320% |
| 1209 | A3A | .320% |
| 1210 | E1A | .256% |
| 1211 | B2C | .503% |
| 1212 | B2A | .503% |
| 1213 | A1 | .320% |
| 1214 | A3B | .320% |
| 1215 | B1A | .383% |
| 1301 | B1B | .383% |
| 1302 | A2 | .320% |
| 1303 | B2B | .503% |
| 1304 | B2 | .503% |
| 1305 | E1 | .256% |
| 1306 | A3 | .320% |
| 1307 | A3D | .320% |
| 1308 | A3C | .320% |
| 1309 | A3A | .320% |
| 1310 | E1A | .256% |
| 1311 | B2C | .503% |
| 1312 | B2A | .503% |
| 1313 | A1 | .320% |
| 1314 | A3B | .320% |
| 1315 | B1A | .383% |
| 1401 | B1B | .383% |
| 1402 | A2 | .320% |
| 1403 | B2B | .503% |
| 1404 | B2 | .503% |
| 1405 | E1 | .256% |
| 1406 | A3 | .320% |

Nm:EMERSON2(946963), Rq:38,66

Deed Book 41978 Pg   541

### EXHIBIT "B"

**Undivided Percentage Interest In The Common Elements
And Liabilities For Common Expenses**

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 1407 | A3D | .320% |
| 1408 | A3C | .320% |
| 1409 | A3A | .320% |
| 1410 | E1A | .256% |
| 1411 | B2C | .503% |
| 1412 | B2A | .503% |
| 1413 | A1 | .320% |
| 1414 | A3B | .320% |
| 1415 | B1A | .383% |
| 1501 | B1B | .383% |
| 1502 | A2 | .320% |
| 1503 | B2B | .503% |
| 1504 | B2 | .503% |
| 1505 | E1 | .256% |
| 1506 | A3 | .320% |
| 1507 | A3D | .320% |
| 1508 | A3C | .320% |
| 1509 | A3A | .320% |
| 1510 | E1A | .256% |
| 1511 | B2C | .503% |
| 1512 | B2A | .503% |
| 1513 | A1 | .320% |
| 1514 | A3B | .320% |
| 1515 | B1A | .383% |
| 1601 | B1B | .383% |
| 1602 | A2 | .320% |
| 1603 | B2B | .503% |
| 1604 | B2 | .503% |
| 1605 | E1 | .256% |
| 1606 | A3 | .320% |
| 1607 | A3D | .320% |
| 1608 | A3C | .320% |
| 1609 | A3A | .320% |
| 1610 | E1A | .256% |
| 1611 | B2C | .503% |
| 1612 | B2A | .503% |
| 1613 | A1 | .320% |
| 1614 | A3B | .320% |
| 1615 | B1A | .383% |
| 1701 | B1B | .383% |
| 1702 | A2 | .320% |
| 1703 | B2B | .503% |
| 1704 | B2 | .503% |
| 1705 | E1 | .256% |
| 1706 | A3 | .320% |
| 1707 | A3D | .320% |
| 1708 | A3C | .320% |

Exhibit "B" – Page 5

**EXHIBIT "B"**    Deed Book 41978 Pg   542

**Undivided Percentage Interest In The Common Elements
And Liabilities For Common Expenses**

| Unit Number | Unit Type | Ownership Percentage |
|---|---|---|
| 1709 | A3A | .320% |
| 1710 | E1A | .256% |
| 1711 | B2C | .503% |
| 1712 | B2A | .503% |
| 1713 | A1 | .320% |
| 1714 | A3B | .320% |
| 1715 | B1A | .383% |
| 1801 | B1B | .383% |
| 1802 | A2 | .320% |
| 1803 | B2B | .503% |
| 1804 | B2 | .503% |
| 1805 | E2 | .256% |
| 1806 | A3 | .320% |
| 1807 | A3D | .320% |
| 1808 | A3C | .320% |
| 1809 | A3A | .320% |
| 1810 | E1A | .256% |
| 1811 | B2C | .503% |
| 1812 | B2A | .503% |
| 1813 | A1 | .320% |
| 1814 | A3B | .320% |
| 1815 | B1A | .383% |
| 1901 | B1B | .383% |
| 1902 | P1 | 2.056% |
| 1906 | A3 | .320% |
| 1907 | A3D | .320% |
| 1908 | A3C | .320% |
| 1909 | A3A | .320% |
| 1910 | E1A | .256% |
| 1911 | B2C | .502% |
| 1912 | B2A | .502% |
| 1913 | A1 | .320% |
| 1914 | A3B | .320% |
| 1915 | B1A | .383% |
|  | **TOTAL:** | **100.00%** |

## EXHIBIT "C"

Deed Book 41978 Pg 543

### PARKING SPACE ASSIGNMENTS

| Unit Number | Parking Space(s) |
|---|---|
| 201 | P - 23 |
| 202 | P - 22 |
| 203 | B - 262 |
| 203 | B - 263 |
| 204 | B - 264 |
| 204 | B - 265 |
| 205 | P - 21 |
| 206 | P - 20 |
| 207 | P - 19 |
| 208 | P - 18 |
| 209 | P - 17 |
| 210 | P - 16 |
| 211 | B - 266 |
| 211 | B - 267 |
| 212 | B - 268 |
| 212 | B - 269 |
| 213 | P - 15 |
| 214 | P - 14 |
| 215 | P - 13 |
| 301 | P - 34 |
| 302 | P - 33 |
| 303 | A - 157 |
| 303 | A - 158 |
| 304 | A - 159 |
| 304 | A - 98 |
| 305 | P - 32 |
| 306 | P - 31 |
| 307 | P - 30 |
| 308 | P - 29 |
| 309 | P - 28 |
| 310 | P - 27 |
| 311 | A - 161 |
| 311 | A - 160 |
| 312 | A - 99 |
| 312 | A - 100 |
| 313 | P - 26 |
| 314 | P - 25 |
| 315 | P - 24 |
| 401 | P - 45 |
| 402 | P - 44 |
| 403 | B - 358 |
| 403 | B - 359 |
| 404 | B - 360 |
| 404 | B - 361 |

**EXHIBIT "C"**

Deed Book 41978 Pg   544

**PARKING SPACE ASSIGNMENTS**

| Unit Number | Parking Space(s) |
|---|---|
| 405 | P - 43 |
| 406 | P - 42 |
| 407 | P - 41 |
| 408 | P - 40 |
| 409 | P - 39 |
| 410 | P - 38 |
| 411 | B - 362 |
| 411 | B - 240 |
| 412 | B - 364 |
| 412 | B - 363 |
| 413 | P - 37 |
| 414 | P - 36 |
| 415 | P - 35 |
| 501 | P - 56 |
| 502 | P - 55 |
| 503 | A - 235 |
| 503 | A - 236 |
| 504 | A - 237 |
| 504 | A - 238 |
| 505 | P - 54 |
| 506 | P - 53 |
| 507 | P - 52 |
| 508 | P - 51 |
| 509 | P - 50 |
| 510 | P - 49 |
| 511 | A - 239 |
| 511 | B - 321 |
| 512 | B - 322 |
| 512 | B - 323 |
| 513 | P - 48 |
| 514 | P - 47 |
| 515 | P - 46 |
| 601 | B - 270 |
| 602 | B - 271 |
| 603 | A - 194 |
| 603 | A - 195 |
| 604 | A - 196 |
| 604 | A - 197 |
| 605 | B - 272 |
| 606 | B - 273 |
| 607 | B - 274 |
| 608 | B - 275 |
| 609 | B - 276 |
| 610 | B - 277 |

Nm:EMERSON2(946963), Rq:38,70

Deed Book 41978 Pg   545

## EXHIBIT "C"

### PARKING SPACE ASSIGNMENTS

| Unit Number | Parking Space(s) |
|---|---|
| 611 | A - 198 |
| 611 | A - 199 |
| 612 | A - 200 |
| 612 | A - 201 |
| 613 | B - 278 |
| 614 | B - 279 |
| 615 | B - 280 |
| 701 | A - 123 |
| 702 | A - 124 |
| 703 | A - 84 |
| 703 | A - 85 |
| 704 | A - 86 |
| 704 | A - 87 |
| 705 | A - 125 |
| 706 | A - 126 |
| 707 | A - 127 |
| 708 | A - 128 |
| 709 | A - 129 |
| 710 | B - 291 |
| 711 | A - 88 |
| 711 | A - 89 |
| 712 | A - 90 |
| 712 | A - 91 |
| 713 | B - 292 |
| 714 | B - 293 |
| 715 | B - 294 |
| 801 | A - 112 |
| 802 | A - 113 |
| 803 | A - 76 |
| 803 | A - 77 |
| 804 | A - 78 |
| 804 | A - 79 |
| 805 | A - 114 |
| 806 | A - 115 |
| 807 | A - 116 |
| 808 | A - 117 |
| 809 | A - 118 |
| 810 | A - 119 |
| 811 | A - 80 |
| 811 | A - 81 |
| 812 | A - 82 |
| 812 | A - 83 |
| 813 | A - 120 |
| 814 | A - 121 |

Deed Book 41978 Pg 546

**EXHIBIT "C"**

**PARKING SPACE ASSIGNMENTS**

| Unit Number | Parking Space(s) |
|---|---|
| 815 | A - 122 |
| 901 | A - 101 |
| 902 | A - 102 |
| 903 | A - 67 |
| 903 | A - 68 |
| 904 | A - 69 |
| 904 | A - 70 |
| 905 | A - 103 |
| 906 | A - 104 |
| 907 | A - 105 |
| 908 | A - 106 |
| 909 | A - 107 |
| 910 | A - 108 |
| 911 | A - 71 |
| 911 | A - 73 |
| 912 | A - 74 |
| 912 | A - 75 |
| 913 | A - 109 |
| 914 | A - 110 |
| 914 | P - 12 |
| 915 | A - 111 |
| 1001 | A - 146 |
| 1002 | A - 147 |
| 1003 | A - 59 |
| 1003 | A - 60 |
| 1004 | A - 61 |
| 1004 | A - 62 |
| 1005 | A - 148 |
| 1006 | A - 149 |
| 1007 | A - 150 |
| 1008 | A - 151 |
| 1009 | A - 152 |
| 1010 | A - 153 |
| 1011 | A - 63 |
| 1011 | A - 64 |
| 1012 | A - 65 |
| 1012 | A - 66 |
| 1013 | A - 154 |
| 1014 | A - 155 |
| 1015 | A - 156 |
| 1101 | B - 252 |
| 1102 | B - 253 |
| 1103 | B - 284 |
| 1103 | B - 285 |

Nm:EMERSON2(946963), Pg:38,72

Deed Book 41978 Pg 547

**EXHIBIT "C"**

**PARKING SPACE ASSIGNMENTS**

| Unit Number | Parking Space(s) |
|---|---|
| 1104 | B - 286 |
| 1104 | B - 287 |
| 1105 | B - 254 |
| 1106 | B - 255 |
| 1107 | B - 256 |
| 1108 | B - 257 |
| 1109 | B - 258 |
| 1110 | B - 259 |
| 1111 | B - 288 |
| 1111 | A - 58 |
| 1112 | B - 290 |
| 1112 | B - 289 |
| 1113 | B - 260 |
| 1114 | B - 261 |
| 1115 | A - 145 |
| 1201 | B - 241 |
| 1202 | B - 242 |
| 1203 | B - 316 |
| 1203 | B - 317 |
| 1204 | B - 318 |
| 1204 | B - 319 |
| 1205 | B - 243 |
| 1206 | B - 244 |
| 1207 | B - 245 |
| 1208 | B - 246 |
| 1209 | B - 247 |
| 1210 | B - 248 |
| 1211 | B - 320 |
| 1211 | B - 281 |
| 1212 | B - 282 |
| 1212 | B - 283 |
| 1213 | B - 249 |
| 1214 | B - 250 |
| 1215 | B - 251 |
| 1301 | B - 347 |
| 1302 | B - 348 |
| 1303 | B - 308 |
| 1303 | B - 309 |
| 1304 | B - 310 |
| 1304 | B - 311 |
| 1305 | B - 349 |
| 1306 | B - 350 |
| 1307 | B - 351 |
| 1308 | B - 352 |

**EXHIBIT "C"**

Deed Book 41978 Pg 548

**PARKING SPACE ASSIGNMENTS**

| Unit Number | Parking Space(s) |
|---|---|
| 1309 | B - 353 |
| 1310 | B - 354 |
| 1311 | B - 312 |
| 1311 | B - 313 |
| 1312 | B - 314 |
| 1312 | B - 315 |
| 1313 | B - 355 |
| 1314 | B - 356 |
| 1315 | B - 357 |
| 1401 | B - 335 |
| 1402 | B - 336 |
| 1403 | B - 300 |
| 1403 | B - 301 |
| 1404 | B - 302 |
| 1404 | B - 303 |
| 1405 | B - 337 |
| 1406 | B - 338 |
| 1407 | B - 339 |
| 1408 | B - 340 |
| 1409 | B - 341 |
| 1410 | B - 342 |
| 1411 | B - 304 |
| 1411 | B - 305 |
| 1412 | B - 306 |
| 1412 | B - 307 |
| 1413 | B - 344 |
| 1414 | B - 345 |
| 1415 | B - 346 |
| 1501 | B - 324 |
| 1502 | B - 325 |
| 1503 | A - 142 |
| 1503 | B - 295 |
| 1504 | A - 144 |
| 1504 | A - 143 |
| 1505 | B - 326 |
| 1506 | B - 327 |
| 1507 | B - 328 |
| 1508 | B - 329 |
| 1509 | B - 330 |
| 1510 | B - 331 |
| 1511 | B - 296 |
| 1511 | B - 297 |
| 1512 | B - 298 |
| 1512 | B - 299 |

Deed Book 41978 Pg 549

## EXHIBIT "C"

## PARKING SPACE ASSIGNMENTS

| Unit Number | Parking Space(s) |
|---|---|
| 1513 | B - 332 |
| 1514 | B - 333 |
| 1515 | B - 334 |
| 1601 | A - 224 |
| 1602 | A - 225 |
| 1603 | A - 166 |
| 1603 | A - 165 |
| 1604 | A - 164 |
| 1604 | A - 163 |
| 1605 | A - 226 |
| 1606 | A - 227 |
| 1607 | A - 228 |
| 1608 | A - 229 |
| 1609 | A - 230 |
| 1610 | A - 231 |
| 1611 | A - 162 |
| 1611 | A - 131 |
| 1612 | A - 133 |
| 1612 | A - 141 |
| 1613 | A - 232 |
| 1614 | A - 233 |
| 1615 | A - 234 |
| 1701 | A - 213 |
| 1702 | A - 214 |
| 1703 | A - 185 |
| 1703 | A - 186 |
| 1704 | A - 187 |
| 1704 | A - 188 |
| 1705 | A - 215 |
| 1706 | A - 216 |
| 1707 | A - 217 |
| 1708 | A - 218 |
| 1709 | A - 219 |
| 1710 | A - 220 |
| 1711 | A - 189 |
| 1711 | A - 190 |
| 1712 | A - 168 |
| 1712 | A - 167 |
| 1713 | A - 221 |
| 1714 | A - 222 |
| 1715 | A - 223 |
| 1801 | A - 202 |
| 1802 | A - 203 |
| 1803 | A - 177 |

Deed Book 41978 Pg 550

**EXHIBIT "C"**

**PARKING SPACE ASSIGNMENTS**

| Unit Number | Parking Space(s) |
|---|---|
| 1803 | A - 178 |
| 1804 | A - 179 |
| 1804 | A - 180 |
| 1805 | A - 204 |
| 1806 | A - 205 |
| 1807 | A - 206 |
| 1808 | A - 207 |
| 1809 | A - 208 |
| 1810 | A - 209 |
| 1811 | A - 181 |
| 1811 | A - 182 |
| 1812 | A - 183 |
| 1812 | A - 184 |
| 1813 | A - 210 |
| 1814 | A - 211 |
| 1815 | A - 212 |
| 1901 | A - 92 |
| 1906 | A - 93 |
| 1907 | A - 94 |
| 1908 | A - 95 |
| 1909 | A - 96 |
| 1910 | A - 97 |
| 1911 | A - 173 |
| 1911 | A - 174 |
| 1912 | A - 175 |
| 1912 | A - 176 |
| 1913 | A - 191 |
| 1914 | A - 192 |
| 1915 | A - 193 |
| 1902 | A - 169, A - 170, A - 171 and A - 172 |

Deed Book 41978 Pg 551

## EXHIBIT "D"

### STORAGE SPACE ASSIGNMENTS

| Unit Number | Storage Space(s) |
|---|---|
| 912 | B130 |
| 315 | B147 |
| 806 | B218 |
| 1304 | B129 |
| 1403 | B241 |
| 1407 | B106 |
| 1503 | B128 |
| 1514 | B127 |
| 1602 | B133 |
| 1604 | B242 |
| 1611 | B107 |
| 1615 | B148 |
| 1702 | B243 |
| 1705 | B146 |
| 1901 | B126 |
| 1907 | B131 |
| 1908 | B132 |
| 1910 | B149 |